**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

*In re* Charter Communications, Inc., *et al.*,

          Debtors.

**BRIEF OF APPELLEE OFFICIAL
COMMITTEE OF UNSECURED
CREDITORS OF CHARTER
COMMUNICATIONS, INC. AND
AFFILIATED DEBTORS IN SUPPORT
OF MOTION TO DISMISS APPEALS
AND IN OPPOSITION TO APPEALS**

Law Debenture Trust Co.,

          Appellant,

   - against -

Charter Communications, Inc., *et al.*

          Appellees.

Case No.  09-CV-10566 (GBD) (DCF)

ECF Case

$R^2$ Investments, LDC,

          Appellant,

   - against -

Charter Communications, Inc., *et al.*

          Appellees.

Case No.  09-CV-10506 (GBD) (DCF)

ECF Case

ROPES & GRAY LLP
David S. Elkind (DE 4054)
Mark R. Somerstein (MS 9721)
Keith H. Wofford (KW 2225)
Nila W. Williams (NW 5969)
Dana L. Myers (DM 0218)
Nicholas Harper-Smith (NH 5109)
1211 Avenue of the Americas
New York, New York  10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ......................................................................................3

    A.    The Debtors' Chapter 11 Plan ......................................................3

        1.    Reduction of Outstanding Debt and Preservation of Tax Benefits .................5

        2.    Reinstatement of Senior Secured Debt ........................................7

        3.    The Rights Offering ..................................................8

        4.    The Allen Settlement.................................................9

    B.    The Bankruptcy Court's Decision and Confirmation Order....................................10

        1.    Law Debenture's Contentions that the Plan Failed to Provide Sufficient Distributions to the Holders of the CCI Notes, Violated the Absolute Priority Rule, or Diverted the Value of the NOLs to Junior Creditors or Equity ..........................................................11

        2.    Law Debenture's Claim that the Requirements of Section 1129(a)(10) Were Not Met.................................................14

        3.    Law Debenture's Claim that the Bankruptcy Court Erred in Approving the Allen Settlement ............................................18

    C.    The Denials of Appellants' Motions for a Stay Pending Appeal ............................23

ARGUMENT ...................................................................................24

I.    THE APPEALS SHOULD BE DISMISSED ON THE GROUND THAT THEY ARE EQUITABLY MOOT ........................................................24

II.    LAW DEBENTURE'S ARGUMENT THAT THE BANKRUPTCY COURT ERRED IN FINDING THAT THE PLAN COMPLIED WITH SECTION 1129(A)(10) OF THE BANKRUPTCY CODE SHOULD BE REJECTED....................................30

    A.    The Separate Classification of CCI General Unsecured Claims Was Proper .........31

    B.    The CCI General Unsecured Claims Were Impaired ...............................34

    C.    The Requirements of Section 1129(a)(10) Were Also Met Because There Were Nine Impaired Classes Voting in Favor of the Plan......................................35

III.    LAW DEBENTURE'S CLAIM THAT THE CCI NOTEHOLDERS WERE ENTITLED TO THE VALUE OF THE NOLS GENERATED BY THE OPERATING COMPANIES AND THAT THE PLAN VIOLATED THE ABSOLUTE PRIORITY RULE ARE WITHOUT MERIT..............................................35

A.    The CCI Noteholders Were Not Entitled to the "Value" of the NOLs ...................36

B.    Law Debenture's Argument that the Plan Violated The Absolute Priority Rule Is Without Merit ................................................................................................38

IV.    APPELLANTS' CLAIM THAT THE BANKRUPTCY COURT ERRED IN APPROVING THE ALLEN SETTLEMENT SHOULD BE REJECTED ......................39

A.    The Bankruptcy Court Properly Approved the Allen Settlement............................39

B.    Appellants' Claim that the Bankruptcy Court Erred in Not Applying the "Entire Fairness" Standard Under Delaware Law ..................................................42

V.    $R^2$'S REMAINING CLAIMS SHOULD BE REJECTED ................................................46

A.    $R^2$'s Claim that They Were "Denied" a Recovery And that the Court Failed to Require a "Stand-Alone" Valuation of CCI ...........................................................46

B.    $R^2$'s Claim That the Bankrutpcy Court Erred In Approving the Releases Provided for in the Plan ........................................................................................47

CONCLUSION....................................................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ad Hoc Comm. of Kenton County Bondholders v. Delta Air Lines, Inc.*,
   309 F. App'x 455 (2d Cir. 2009) ...............................................................................4, 25, 30

*Adiel v. The Pharmacy Fund, Inc.*,
   2000 WL 1206742 (S.D.N.Y. Aug. 23, 2000) ...............................................................25, 26

*Allstate Ins. Co. v. Hughes*,
   174 B.R. 884 (S.D.N.Y. 1994) ......................................................................................26, 29

*B & M Inv., LLC v. Calise*,
   2009 WL 4249755 (2d Cir. Nov. 30, 2009) .......................................................................25

*BDC Finance, L.L.C. v. Metaldyne Corp. (In re Metaldyne Corp.)*,
   421 B.R. 620 (S.D.N.Y. 2009) ...........................................................................................30

*BNP Paribas v. Nat'l Restaurants Mgmt., Inc. (In re Nat'l Restaurants Mgmt., Inc.)*,
   2001 WL 220023 (S.D.N.Y. Mar. 7, 2001) ........................................................................25

*Boston Post Road L.P. v. FDIC (In re Boston Post Road, L.P.)*,
   21 F.3d 477 (2d Cir. 1994) ................................................................................................31

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
   416 F.3d 136 (2d Cir. 2005) .........................................................................25, 27, 29, 47

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
   10 F.3d 944 (2d Cir. 1993) ............................................................................................29, 31

*Griffin v. Box Bros. Holding Co. (In re Box Bros. Holding Co.)*,
   194 B.R. 32 (D. Del. 1996) .................................................................................................26

*High River Ltd. P'ship v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*,
   2002 WL 500569 (D. Del. Mar. 26, 2002) .........................................................................25

*In re 500 Fifth Ave. Assocs.*,
   148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ..............................................................................31

*In re Adelphia Commc'ns Corp.*,
   327 B.R. 143 (Bankr. S.D.N.Y. 2005) ................................................................................41

*In re Adelphia Commc'ns Corp.*,
   367 B.R. 84 (S.D.N.Y. 2007)..................................................................25, 26, 27, 28, 29

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007)...................................................................36

*In re Amster Yard Assocs.*,
   214 B.R. 122 (Bankr. S.D.N.Y. 1997)...................................................................34

*In re AOV Indus., Inc.*,
   792 F.3d 1140 (D.C. Cir. 1986).........................................................................29, 30

*In re Best Prods. Co., Inc.*,
   68 F.3d 26 (2d Cir. 1995) ..................................................................................30

*In re Buttonwood Partners, Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y. 1990)....................................................................44

*In re Calpine Corp.*,
   390 B.R. 508 (S.D.N.Y. 2008)........................................................................25, 28

*In re Chateaugay Corp.*,
   156 B.R. 391 (S.D.N.Y. 1993)..............................................................................34

*In re Continental Airlines*,
   91 F.3d 553 (3d Cir. 1996)...........................................................................25, 27

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ......................................................................32

*In re Delta Airlines, Inc.*,
   374 B.R. 516 (S.D.N.Y. 2007)......................................................................27, 28, 29

*In re Delta Airlines, Inc.*,
   386 B.R. 518 (Bankr. S.D.N.Y. 2008) ............................................................26, 27, 29

*In re Drexel Burnham Lambert Group, Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ....................................................................31

*In re Dura Auto. Sys., Inc.*,
   403 B.R. 300 (D. Del. 2009) ........................................................................25, 29

*In re Enron Corp.*,
   2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) .......................................35

*In re Enron Corp.*,
   326 B.R. 497 (S.D.N.Y. 2005)..............................................................................26

*In re Food City, Inc.*,
110 B.R. 808 (Bankr. W.D. Tex. 1990) ...................................................................44, 45

*In re Frascella Enters., Inc.*,
360 B.R. 435 (Bankr. E.D. Pa. 2007) .....................................................................44, 45

*In re General Dev. Corp.*,
135 B.R. 1002 (Bankr. S.D. Fla. 1991) .......................................................................44

*In re Global Vision Prods., Inc.*,
2009 WL 2170253 (S.D.N.Y. July 14, 2009) .............................................................30

*In re Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) .............................................................................34

*In re Ionosphere Clubs, Inc.*,
98 B.R. 174 (Bankr. S.D.N.Y. 1989) ...........................................................................32

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987) ......................................................................................31

*In re Lennington*,
288 B.R. 802 (Bankr. C.D. Ill. 2003) ............................................................................7

*In re Madison Hotel Assocs.*,
749 F.2d 410 (7th Cir. 1984) .........................................................................................7

*In re NextWave Pers. Commc'ns, Inc.*,
244 B.R. 253 (Bankr. S.D.N.Y. 2000) ...........................................................................7

*In re Prudential Lines, Inc.*,
928 F.2d 565 (2d Cir. 1991) ...................................................................................37, 38

*In re Source Enters., Inc.*,
392 B.R. 541 (S.D.N.Y. 2008) .....................................................................................28

*In re Sovereign Group, 1984-21 Ltd.*,
88 B.R. 325 (Bankr. D. Colo. 1988) ............................................................................44

*In re SPA, Inc.*,
2001 WL 34750646 (Bankr. M.D. Pa. Sept. 28, 2001) ...............................................35

*In re Stone Barn Manhattan LLC*,4
405 B.R. 68 (Bankr. S.D.N.Y. 2009) ...........................................................................41

*In re Teltronics Servs.*,
762 F.2d 185 (2d Cir. 1985) ........................................................................................41

*In re UNR Indus.*,
    20 F.3d 766 (7th Cir. 1994) ............................................................................25, 29

*In re WorldCom, Inc.*,
    347 B.R. 123 (Bankr. S.D.N.Y. 2006) .........................................................40

*Int'l Asset Recovery Corp. v. Thomson McKinnon Secs. Inc.*,
    335 B.R. 520 (S.D.N.Y. 2005)......................................................................34

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter
    Commc'ns)*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ......................................................... passim

*Kaiser Aerospace & Elec. Corp. v. Teledyne Indus. (In re Piper Aircraft Corp.)*,
    244 F.3d 1289 (11th Cir. 2001) ....................................................................44

*Kassover v. Gibson*,
    2003 WL 21222341 (S.D.N.Y. May 27, 2003) ............................................29, 30

*Lawrence v. Revere Copper and Brass Inc. (In re Revere Copper and Brass Inc.)*,
    78 B.R. 17 (S.D.N.Y. 1987)..........................................................................26, 30

*Magten Asset Mgmt. Corp. v. Northwestern Corp. (In re Northwestern Corp.)*,
    2006 WL 2801871 (D. Del. Sept. 29, 2006)................................................25

*Maytag Corp. v. Navistar Int'l Transp. Corp.*,
    219 F.3d 587 (7th Cir. 2000) ........................................................................38

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium
    Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007)..........................................................................40, 42, 45

*Nisselson v. Drew Indus. Inc. (In re White Metal Rolling and Stamping Corp.)*,
    222 B.R. 417 (Bankr. S.D.N.Y. 1998)..........................................................37

*Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official
    Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*,
    988 F.2d 322 (2d Cir. 1993)..........................................................................26, 30

*Official Comm. of Unsecured Creditors v. SGPA, Inc. (In re SGPA, Inc.)*,
    34 F. App'x 49 (3d Cir. 2002) ......................................................................25

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968).......................................................................................40

*Resolution Trust Co. v. Best Prods. Co., Inc. (In re Best Prods. Co., Inc.)*,
    177 B.R. 791 (S.D.N.Y. 1995).......................................................................42, 45

*SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),*
   960 F.2d 285 (2d Cir. 1992) .................................................................................................47

*Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.),*
   92 B.R. 38 (S.D.N.Y. 1988) ...........................................................................................26, 29

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.,*
   41 F.3d 1570 (2d Cir. 1994) .................................................................................................30

*United Savings Ass'n v. Timbers of Inwood Forest,*
   484 U.S. 365 (1988) .............................................................................................................34


**STATUTES**

11 U.S.C. § 1101(2) ...................................................................................................................27

11 U.S.C. § 1123(b)(1) .................................................................................................................7

11 U.S.C. § 1123(b)(5) .................................................................................................................7

11 U.S.C. § 1124(2) .....................................................................................................................7

11 U.S.C. § 1129(a)(7) ...................................................................................................35, 36, 38

11 U.S.C. § 1129(a)(10) .............................................................................................................35

11 U.S.C. § 1129(b)(1) ...............................................................................................................38


**FEDERAL RULES**

Fed. R. Bankr. P. 8013 ...............................................................................................................30


**OTHER AUTHORITIES**

7 COLLIER ON BANKRUPTCY ¶ 1124.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed) ...................................................................................................................................7

The Official Committee of Unsecured Creditors of Charter Communications, Inc., *et al.* (the **"Creditors' Committee"**) submits this Memorandum of Law (a) in support of the motions of Appellee Charter Communications, Inc. and its affiliates (collectively, the **"Debtors"** or **"Charter"**) and Appellee Creditors' Committee to dismiss the appeals of Law Debenture Trust Company of New York (**"Law Debenture"**), as indenture trustee for the 6.50% Convertible Senior Notes due 2027 issued by Charter Communications, Inc. (the **"CCI Notes"**), and $R^2$ Investments, LDC (**"$R^2$,"** and together with Law Debenture, the **"Appellants"**), and (b) in opposition to the appeals of Law Debenture and $R^2$ from the Findings of Fact and Conclusions of Law and Order Confirming Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the **"Confirmation Order"**),[1] and the Opinion on Confirmation of Plan of Reorganization and Adjudication of Related Adversary Proceeding (the **"Decision"**),[2] confirming the Debtors' chapter 11 plan of reorganization (the **"Plan"**), entered by the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**) on November 17, 2009.

## PRELIMINARY STATEMENT

By these appeals, Appellants Law Debenture, on behalf of holders of the notes of the Debtors' parent holding company, Charter Communications, Inc. (**"CCI"**), and $R^2$, a holder of CCI stock, appeal confirmation of Charter's chapter 11 Plan. Following Appellants' unsuccessful efforts to obtain stays of the Confirmation Order pending appeal, the Plan became effective on November 30, 2009, and the transactions contemplated by the Plan were closed long ago. Pursuant to the Plan, Charter, a highly leveraged company which had struggled with a huge

---

[1] *In re Charter Commc'ns, et al.*, Case No. 09-11435 (Bankr. S.D.N.Y. Nov. 19, 2009), Docket No. 921.

[2] The Decision is published as *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) (the **"Decision"**).

debt burden for years, was able to reduce its debt by approximately $8 billion, eliminate more than $830 million of annual interest expense, and, at a time of unprecedented turbulence in the financial markets, raise $1.6 billion of new equity through a rights offering described below. As the Bankruptcy Court stated in its Decision confirming the Plan, the Plan represented an "extraordinary achievement" which enabled the Debtors to avoid a potentially catastrophic free-fall bankruptcy, while "providing for new investment, debt forgiveness, [and the] preservation of intangible assets." *Decision*, 419 B.R. at 231, 233. The Plan was strongly supported by the Creditors' Committee and overwhelmingly approved by the creditors.

Following confirmation of the Plan, motions for a stay of the Confirmation Order pending these appeals, filed by Law Debenture, R[2], and others who are no longer pursuing appeals, were denied by the Bankruptcy Court and by Judge Sidney Stein in this Court. On November 30, 2009, the Plan became effective, and the transactions contemplated by the Plan – including the issuance of new debt and equity securities in place of prepetition claims, the transfer of the Debtors' assets to the reorganized Debtors, the closing of a $1.6 billion rights offering under the Plan, and the many other transactions contemplated and provided for, in the Plan – were closed. These appeals should be denied both because they are (i) now equitably moot under the law of this and virtually every other federal circuit, and (ii) baseless on the merits.

As described below, the law is clear that, once a chapter 11 plan is confirmed and the transactions contemplated by the plan are consummated, an appeal of a confirmation order is deemed equitably moot because the transactions contemplated by the plan cannot be undone. This is particularly the case with a complex chapter 11 plan such as Charter's, pursuant to which numerous transactions were closed long ago and the Debtors have been operating as reorganized

entities.  In order to pursue an appeal of a confirmation order, a party must obtain a stay pending appeal and, if it is successful in obtaining such a stay, post the sizeable bond that would undoubtedly be required for such a stay to protect creditors during the pendency of the appeal.  If a party cannot obtain a stay or post the bond, the party is precluded from pursuing its appeal because the plan cannot be undone.  The appeals of Law Debenture and $R^2$ are moot and should be dismissed.

If this Court does reach the merits of the Law Debenture and $R^2$ appeals, the appeals should be rejected on the merits.  Notwithstanding Law Debenture's efforts to increase the recoveries of the holders of the CCI Notes (the **"CCI Noteholders"**), the record is clear that the CCI Noteholders received everything they were entitled to receive under the Plan and considerably more.  The claim that the CCI Noteholders were entitled to the benefit of net operating loss carryforwards (**"NOLs"**) generated by the operating subsidiaries is baseless, because the law makes it clear that those NOLs belonged for bankruptcy purposes to the subsidiaries which generated them and not to CCI and because the trial record established that NOLs could have no value to the parent company which produces no revenues or income of its own.  The claims that the Plan improperly classified creditor groups, "artificially impaired" claims, or violated the other rights of the CCI Noteholders or $R^2$, an equity holder, are completely without merit.

These appeals should be dismissed, or, if they are not dismissed, they should be denied.

## STATEMENT OF FACTS

### A.     The Debtors' Chapter 11 Plan

On March 27, 2009 (the **"Petition Date"**), the Debtors, entities with more than $21.7 billion of debt, filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the **"Bankruptcy Code"**), commencing what the Bankruptcy Court described as "perhaps

the largest and most complex prearranged bankruptcies ever attempted." *Decision*, 419 B.R. at 230.

Contemporaneous with the filing of the petitions, the Debtors filed a pre-negotiated chapter 11 plan.  The Plan was the product of extensive prepetition negotiations with key constituencies, including an *ad hoc* committee (the **"Crossover Committee"**) representing the principal bondholders of CCH I, LLC (**"CCH I"**) and CCH II, LLC (**"CCH II"**), two of the Debtors' subsidiaries that were issuers of a substantial portion of the Debtors' outstanding debt, and entities controlled by Paul G. Allen (**"Mr. Allen"**), the controlling shareholder of the Debtors.[3]

Following the Bankruptcy Court's approval of the Debtors' disclosure statement on May 7, 2009, creditors voted overwhelmingly in favor of the Plan.  After a 19-day trial over objections to the Plan and objections of the Debtors' senior lenders to reinstatement of the senior secured debt under section 1124 of the Bankruptcy Code, the Bankruptcy Court, on November 17, 2009, issued its Decision confirming the Plan and rejecting the objections.  *Id.* at 221.  On the same date, the Bankruptcy Court entered the Confirmation Order, which included 72 pages of findings of fact and conclusions of law.  Although the senior lenders also filed notices of appeal, their appeals have been withdrawn.

The critical features of the Plan are as follows:

---

[3] The Debtors' corporate structure consists, basically, of the following:  CCI is a holding company which was and is publicly traded.  CCI, in turn, owned approximately 55% of the interests in Charter Communications Holding Company LLC (**"HoldCo"**), another holding company, and Charter Investment, Inc. (**"CII"**), an entity controlled by Mr. Allen, controlled the remaining 45% of Holdco.  Beneath Holdco were a number of additional holding companies, including several that are referred to below as the "Designated Holding Companies," including CCH I and CCH II, and beneath those holding companies was Charter Communications Operating, LLC (**"CCO"**), the principal operating company of the Debtors.  Prior to the effective date of the Plan, Mr. Allen owned approximately 7% of the equity of CCI and approximately 91% of the voting rights of CCI; in addition to his ownership of CII, which controlled approximately 55% of the interests of Holdco.

### 1.      Reduction of Outstanding Debt and Preservation of Tax Benefits

The Plan enabled Charter to reduce its outstanding debt by approximately $8 billion and eliminate more than $830 million of annual interest expense.  At a time of unprecedented turbulence in the financial markets, the Plan enabled Charter to raise $1.6 billion of new equity through a Rights Offering (defined below).  As a result of the settlement with Mr. Allen and the entities which he controlled (the **"Allen Settlement"**), the Plan allowed the Debtors to reinstate $8.4 billion of their senior secured debt pursuant to section 1124 of the Bankruptcy Code, and enabled the Debtors to preserve more than $2.8 billion of NOLs and billions of dollars of additional tax benefits.  The Plan maximized recoveries for creditors and allowed the Debtors to avoid a protracted "free fall" chapter 11 proceeding that would have been devastating for the Debtors and creditors.  Creditors voted overwhelmingly in favor of the Plan and the Creditors' Committee strongly supported the Plan.

The Charter corporate structure consists of a parent holding company, CCI, and a series of subsidiaries down a corporate chain, each of which were issuers of substantial amounts of public debt.  The principal operating company is CCO, a subsidiary in the corporate structure below a number of other subsidiaries.  Because CCI is a holding company with no operations of its own other than its ownership of stock of the other Charter entities, the CCI Notes for which Appellant Law Debenture serves as indenture trustee were structurally subordinated to claims of creditors of the other Charter entities, including more than $19 billion of debt issued by Charter's operating companies and subsidiaries.  Notwithstanding their structural subordination, the CCI Noteholders received recoveries of more than 32.7% under the Plan.  *Id.*

The following is a chart of the Charter corporate structure and the recoveries which each group of noteholders received under the Plan:



Public Common Stock / Other Equity
[No Recovery]
93% common equity interest
9% voting interest
7 % common equity
91 % voting interest
Paul Allen
100%
CCI NOTES ($497M)
5.875% Convert. Sr. Notes due 2009
6.50% Convert. Sr. Notes due 2027
Distribution: $24.5M cash + $138.4M New CCI PIK Preferred Stock
Estimated Recovery: 32.7%
Charter Communications, Inc. ("CCI")
Charter Investment, Inc. ("CII")
CCH NOTES ($599M)
10.00% Sr. Notes due 2009
10.75% Sr. Notes due 2009
9.625% Sr. Notes due 2009
10.25% Sr. Notes due 2010
11.75% Sr. Disc. Notes due 2010
11.125% Sr. Notes due 2011
13.5% Sr. Disc. Notes due 2011
9.92% Sr. Disc. Notes due 2011
10.00% Sr. Notes due 2011
11.75% Sr. Disc. Notes due 2011
12.125% Sr. Disc. Notes due 2012
Distribution: CCH 5 -Yr Warrants for New CCI Class A Common Stock
Estimated Recovery: 0.4%
Charter Communications Holding Company, LLC ("HoldCo")
46 % common equity
CCHC, LLC ("CCHC")
$75M Subordinated Note
Charter Communications Holdings, LLC ("CCH")
CIH NOTES ($2.625B)
11.125% Sr. Notes due 2014
13.50% Sr. Disc. Notes due 2014
9.92% Sr. Disc. Notes due 2014
10.00% Sr. Notes due 2014
11.75% Sr. Disc. Notes due 2014
12.125% Sr. Disc. Notes due 2015
Distribution: CIH 5 -Yr Warrants for New CCI Class A Common Stock
Estimated Recovery: 0.5%
CCH I Holdings, LLC ("CIH")
CCH I NOTES ($4.17B)
11.00% Sr. Notes due 2015
Distribution: Common Stock + Rights Offering
Estimated Recovery: 12.7%
CCH I, LLC ("CCH I")
CCH II NOTES ($2.57B)
10.25% Sr. Notes due 2010
10.25% Sr. Notes due 2013
Distribution: Cash or Debt Exchange
Estimated Recovery: 100%
CCH II, LLC ("CCH II")
CCO Holdings, LLC ("CCO Holdings")
CCOH NOTES ($858M)
8.75% Sr. Notes due 2013
THIRD LIEN CREDIT FACILITY ($361M)
Charter Communications Operating, LLC ("CCO")
CCO NOTES ($2.4B)
8.00% Sr. 2d Lien Notes due 2012
8.375% Sr. 2d Lien Notes due 2014
10.875% Sr. 2d Lien Notes due 2014
FIRST LIEN CREDIT FACILITY ($8.247B)
REINSTATED DEBT
[CCO Subsidiaries]

### 2.     Reinstatement of Senior Secured Debt

The cornerstone of the Plan was the reinstatement of approximately $11.8 billion of the Debtors' senior secured debt pursuant to section 1124 of the Bankruptcy Code.  Under section 1124, debtors are permitted to reinstate their outstanding debt in accordance with its existing maturities and contractual terms of the debt, provided that they comply with the terms of the existing credit agreements in the future.[4]  The Debtors reinstated: (i) $8.2 billion of their debt under a first lien credit facility governed by an amended and reinstated credit agreement, dated as of March 18, 1999, among CCO, the Debtors' principal operating subsidiary, as borrower, JPMorgan Chase Bank, N.A. ("**JPMorgan**"), as administrative agent, and various lenders; (ii) $350 million of debt under a third lien credit facility governed by a credit agreement, dated as of March 6, 2007, among CCO Holdings, LLC ("**CCO Holdings**"), as borrower, Bank of America, N.A., as administrative agent, and certain lenders; and (iii) approximately $3.2 billion in outstanding notes issued by CCO and CCO Holdings.

---

[4] Section 1124(2) of the Bankruptcy Code provides that a debtor's chapter 11 plan may reinstate the original terms of its prepetition debt obligations, de-accelerate any acceleration of the debt, and reinstate the original maturities of the debt, provided that the plan cures any defaults that are required to be cured under the provisions of the Bankruptcy Code and the debtor complies with its obligations under the applicable credit agreements in the future. 11 U.S.C. §§ 1123(b)(1), (5), 1124(2); *see also In re Madison Hotel Assocs.,* 749 F.2d 410, 420 (7th Cir. 1984); *In re Lennington*, 288 B.R. 802, 804 (Bankr. C.D. Ill. 2003) (permitting reinstatement of mortgage); *In re NextWave Pers. Commc'ns, Inc.,* 244 B.R. 253, 268 (Bankr. S.D.N.Y. 2000) (section 1124 permits the plan to reinstate the original maturity of the creditor's claim or interest without impairing such claim or interest); 7 COLLIER ON BANKRUPTCY ¶ 1124.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("[S]ection 1124(2) permits the plan to reinstate the original maturity of the claim or interest as it existed before the default without impairing the claim or interest.").

Where a debt obligation is to be reinstated, it must be reinstated on the same terms as the existing agreement between the parties, with the exception that defaults arising out of the filing of bankruptcy petitions or defaults relating to the financial condition of the debtors are "deemed cured" under section 1124(2)(B).  Under section 1124(2)(B), a default of the type described in section 365(b)(2) of the Bankruptcy Code is not required to be "cured" as a condition for reinstatement, but is instead deemed "cured" by the Bankruptcy Code.  Defaults of this type that are "deemed cured" are so-called *ipso facto* defaults arising out of, or relating to, the filing of chapter 11 petitions, including acceleration of debt arising out of the filing of bankruptcy petitions, and defaults relating to the financial condition of debtors, such as insolvency, ratio defaults, and other defaults relating to financial condition.

Absent reinstatement of the senior secured debt, the Plan could not have been confirmed. The Debtors would have been required to attempt to obtain replacement financing for the $8.4 billion of senior secured debt in the marketplace.  In all likelihood, the Debtors would have been unable to obtain such a large amount of alternative financing given the prevailing market conditions, and, even if replacement financing could have been obtained, it was estimated that the Debtors would have been required to pay as much as $500 million per year of additional interest expense over the interest expense under the reinstated credit agreements.  As described below, the Allen Settlement enabled the senior debt to be reinstated.

### 3.        The Rights Offering

Another essential element of the Plan was a rights offering (the **"Rights Offering"**) pursuant to which the Debtors successfully raised approximately $1.6 billion of new equity capital.  The proceeds of the Rights Offering were necessary to fund the Plan, the Debtors' ongoing business operations, and the Allen Settlement.  Without the Rights Offering, the Plan could not have been consummated.  Pursuant to the Rights Offering, holders of the 11.00% Senior Notes Due 2015 issued by CCH I (the **"CCH I Notes"**) and others committed to purchase $1.6 billion of the reorganized Debtors' new equity.  The Rights Offering, believed to be the largest rights offering ever in a chapter 11 case, was particularly remarkable given the difficult financial markets in which it was achieved.  The obligations of the parties who committed to purchase the $1.6 billion of new equity pursuant to the Rights Offering were contingent upon confirmation of the Plan, reinstatement of the senior secured debt, and approval of the Allen Settlement.

4.  **The Allen Settlement**

The Allen Settlement was also essential to the Plan.  Without the settlement, the senior secured debt could not have been reinstated and the Debtors would have lost the benefit of billions of dollars of NOLs and other tax benefits.

Under the credit agreements governing the reinstated senior debt, the failure of Mr. Allen and his affiliated entities (collectively, the **"Paul Allen Group"**) to hold at least 35% of the "voting rights" in the Debtors would have constituted a "change of control" and an event of default, precluding reinstatement of the senior debt.  While the credit agreements did not require that the Paul Allen Group own any specific percentage of the equity or financial interest in the Debtors, they required that the Paul Allen Group hold at least 35% of the voting rights. Accordingly, absent an agreement by the Paul Allen Group to retain equity giving it 35% of the "voting rights," the senior secured debt could not have been reinstated, and the Plan could not have been confirmed.  Moreover, because CII, an entity controlled by Mr. Allen, owned approximately 45% of the interests of HoldCo, one of the Charter entities just below CCI (*see supra*, p. 6), the settlement with Mr. Allen was essential to the preservation of billions of dollars of NOLs and other tax benefits of the Debtors.  *Decision*, 419 B.R. at 253.

Pursuant to the Allen Settlement, Mr. Allen's economic stake in the company was dramatically reduced, but he agreed to hold 35% of the voting power of the reorganized entities. While the Plan cancelled all of the prepetition stock of the Debtors, including the equity held by Mr. Allen and the Paul Allen Group, CII, the entity controlled by Mr. Allen, received new Class B shares of the reorganized Debtors equivalent to 2% of the equity value of the reorganized Debtors and 35% of the "voting power" of the CCI stock.  In addition, the Paul Allen Group agreed to take no action that would result in the loss of the Debtors' NOLs and other valuable tax benefits.

The benefits received by the Debtors from the Allen Settlement thus included: (i) the ability to reinstate the $8.4 billion of senior debt; (ii) preservation of the Debtors' NOLs, which were valued at more than $2.8 billion; (iii) preservation of billions of dollars of other tax benefits that will result from the Debtors' ability to "step up" the tax bases of their assets; and (iv) the transfer by CII, an entity controlled by Mr. Allen, to the Debtors of CII's preferred stock interests in CC VIII, LLC (**"CC VIII"**), a jointly owned entity, which alone had a value to the Debtors of approximately $135-165 million; and (v) the transfer of other assets, rights, and claims from Mr. Allen to the Debtors. *Id.* at 253-54.

### B. The Bankruptcy Court's Decision and Confirmation Order

Shortly after the Petition Date, JPMorgan, as agent for the lenders under the principal secured credit facility to be reinstated under the Plan, commenced an adversary proceeding in the Bankruptcy Court alleging that there were defaults under the credit agreements which precluded reinstatement of the senior secured debt. The adversary proceeding, objections to reinstatement of the senior secured debt, and objections to confirmation of the Plan were coordinated for purposes of discovery and trial. Between May and July, 2009, the parties took more than 40 depositions and produced millions of pages of documents.

On July 20, 2009, the Bankruptcy Court commenced a 19-day trial of the objections to confirmation and reinstatement. The Court heard the live testimony of dozens of witnesses, including experts, tens of thousands of pages of exhibits were introduced, extensive deposition testimony was presented, and the Court heard days of pre- and post-trial argument.

On November 17, 2009, the Bankruptcy Court issued the Decision and the Confirmation Order confirming the Plan, denying the objections to confirmation, and reinstating the senior debt. *Id.* at 221. The Bankruptcy Court rejected Law Debenture's and R[2]'s objections on the

basis of the extensive factual record and, for the most part, on multiple grounds.  With respect to

their objections, the Bankruptcy Court ruled as follows:

> 1.  **Law Debenture's Contentions that the Plan Failed to Provide Sufficient Distributions to the Holders of the CCI Notes, Violated the Absolute Priority Rule, or Diverted the Value of the NOLs to Junior Creditors or Equity**

Although the CCI Notes were structurally subordinated to the claims of other creditors,

including $19 billion of other debt, Law Debenture argued that the CCI Noteholders were

entitled to more than the 32.7% recovery that they received under the Plan.  Law Debenture

argued that the CCI Noteholders were entitled to the "value" of the NOLs generated by the

operating subsidiaries and that the Plan improperly "diverted" that value from the CCI

Noteholders to junior creditors or to equityholders.  The Bankruptcy Court found those

contentions to be without merit.

The Bankruptcy Court found that the CCI Noteholders, which were structurally

subordinated in right of payment, not only received everything which they were entitled to

receive under the Bankruptcy Code for confirmation of the Plan, but that they received *far in

excess* of that amount:

> Under the provisions of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), the CCI Noteholders are entitled to receive distributions "of a value, as of the effective date of the [P]lan, that is not less than the amount that [they] would so receive ... if the [Debtors] were liquidated under chapter 7." 11 U.S.C. § 1129(a)(7). The CCI Noteholders are, contrary to their argument, receiving in excess of that . . . .
>
> <div align="center">*       *       *</div>
>
> In the event of liquidation under chapter 7, the CCI Noteholders' recovery would amount to approximately 18.4% of their claims that are structurally subordinated to the claims of all other creditors of the Debtors, including more than $19 billion in other debt. *See* 8/17/09 Tr. at 55-57 (Doody); Cmte. Br. Supp. at 45. The Plan is demonstrably more favorable and is structured to provide the CCI Noteholders with a recovery well in excess of that amount--

approximately 32.7%. Indeed, despite their subordinated rank in the capital structure, the CCI Noteholders are being offered the highest percentage recovery under the Plan among all of the Debtors' unsecured noteholders.

*Id.* at 242, 261.

The Bankruptcy Court rejected Law Debenture's claim that the CCI Noteholders were entitled to receive the "value" of the NOLs generated by the operating subsidiaries both because (i) as the case law establishes, NOLs generated by the operating subsidiaries belong for bankruptcy purposes to the subsidiaries which generated them, not to a parent holding company (even if the parent files the consolidated tax returns); and (ii) even if CCI did have some right to the NOLs, the NOLs would have had no value to CCI because CCI has no operations or income of its own.  The Bankruptcy Court wrote:

> Generally, NOLs are deemed to belong to the operating entity that generated them. Under the circumstances of this case, that would be CCO, not CCI. *See, e.g., Nisselson v. Drew Indus. Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 424 (Bankr.S.D.N.Y.1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss corporation that generated them.").

*Id.* at 264.[5]  The Bankruptcy Court further wrote:

---

[5] As the Bankruptcy Court further wrote:

> As discussed above, the CCI Noteholders have argued about the existence and possible value of NOLs without offering any evidence that CCI actually had any rights to separately profit from or harvest the value of these tax attributes that may actually belong to CCO. *See In re Prudential Lines, Inc.*, 928 F.2d 565, 569-70 (2d Cir.1991) (affirming order enjoining parent corporation from taking action that would affect debtor subsidiary's use of NOLs generated as a result of subsidiary operations on the basis that the debtor subsidiary owned the NOLs); *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 424 (Bankr.S.D.N.Y.1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss corporation that generated them"). Regardless of which legal entity in fact owns the NOLs, the CCI Noteholders have not established that their treatment under the Plan deprives them of anything to which they have any provable entitlement.

*Decision*, 419 B.R. at 269.

> The Debtors' liquidation analysis also properly reflects the fact that, in a hypothetical chapter 7 liquidation of CCI, the NOLs would have no value and thus not be a source of potential added recovery for the CCI Noteholders. *See* 8/17/09 Tr. at 37-41 (Doody). This is so because CCI is not an operating company and does not produce any income of its own against which the NOLs could be utilized. *Official Comm. of Unsecured Creditors v. PSS Steamship Co., Inc. (In re Prudential Lines, Inc.)*, 107 B.R. 832, 841 (Bankr.S.D.N.Y.1989), *aff'd*, 928 F.2d 565 (2d Cir.1991). *See also Loop Corp. v. U.S. Trustee,* 379 F.3d 511, 518-19 (8th Cir.2004) (affirming bankruptcy court's conversion of case from chapter 11 to chapter 7 despite the fact that the debtor's NOLs may have value in a chapter 11 but would have no value in a chapter 7 liquidation); *Maytag Corp. v. Navistar Int'l Transp. Corp.*, 219 F.3d 587, 590-91 (7th Cir.2000) ("Tax attributes cannot be sold or given away; only the company that generated the losses may use them. When the bankruptcy wrapped up, accumulated tax losses were a major asset of the estate. It would have been folly to throw them away, as a liquidation would have done").

*Id.* at 263; *see also,* Confirmation Order, at I.M.1(viii)(b).  The Bankruptcy Court found that Law Debenture's expert had failed to support any legitimate claim that the CCI Noteholders were entitled to an additional recovery.  *Decision*, 419 B.R. at 242, 261-62.

The Bankruptcy Court rejected Law Debenture's claim that the Plan violated the absolute priority rule under Bankruptcy Code section 1129(b) because the value of the NOLs was allegedly "transferred" to junior creditors or equityholders.  The Bankruptcy Court found that, because the NOLs did not "belong" to CCI for bankruptcy purposes and had no value to CCI, there was no substance to the claim that the "value" of the NOLs was diverted from the parent or its creditors.  *Id.* at 264.[6]  The Bankruptcy Court also found that there was no violation of the

---

[6] The Bankruptcy Court wrote:

> Moreover, while the CCI Noteholders focused considerable attention during the trial on the potential value of the NOLs, no tax expert testified for any party, and the record is devoid of any reliable evidence relating to the actual value to CCI of the NOLs even if CCI were considered to be the owner of the NOLs. Generally, NOLs are deemed to belong to the operating entity that generated them. Under the circumstances of this case, that would be CCO, not CCI. *See, e.g., Nisselson v. Drew Indus. Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 424 (Bankr. SDNY 1998) ("It is beyond peradventure that NOL carrybacks

absolute priority rule because neither Mr. Allen nor any of the other equityholders received any value or distribution on account of prepetition equity, and because no value was transferred from CCI to junior creditors or to any other equity.  *Id.* at 268-69.  The Bankruptcy Court found that Mr. Allen's prepetition equity, like the equity of other holders, was cancelled under the Plan, and that the only consideration paid to Mr. Allen under the Allen Settlement was given in exchange for the promises, commitments, and transfers of assets made by the Paul Allen Group under the settlement.  *Id.* at 241 n.15, 268-69.

### 2.   Law Debenture's Claim that the Requirements of Section 1129(a)(10) Were Not Met

Law Debenture argued in the Bankruptcy Court that the requirements of Bankruptcy Code section 1129(a)(10) (requiring at least one class of impaired creditors to accept the Plan) were not met either because (i) the holders of general unsecured claims against CCI and Holdco (whose claims were in Classes A-3 and C-3) allegedly were improperly classified as separate classes from the holders of the CCI Notes, or (ii) the holders of the Class A-3 claims (the **"CCI General Unsecured Claims"**) and C-3 claims were allegedly "artificially impaired."  Law Debenture also argued that the holders of the CCI Notes were improperly "discriminated against" because the holders of Class A-3 and C-3 claims, who had the right to have a portion of their claims paid by the operating subsidiaries pursuant to a management agreement between CCI and CCO (the **"Management Agreement"**),[7] received greater recoveries than the

---

and carryovers are property of the estate of the loss corporation that generated them"). However, regardless of which Charter entity generated the NOLs, because of the lack of any convincing proof of ownership or the ability to convert the NOLs into measurable proceeds, the Court is unable to find that CCI has been deprived of any value associated with Charter's tax attributes.

*Decision*, 419 B.R. at 264.

[7] A copy of the Management Agreement is available on the Court's docket.  *See* Case No. 09-cv-10566, Docket No. 17, Ex. 8.

recoveries received by the holders of the CCI Notes.  The Bankruptcy Court rejected these claims.

The Bankruptcy Court noted, first, that, under the applicable law, debtors enjoy "considerable discretion" in classifying similar claims in different classes where there are differences between the underlying claims.  *Id.* at 264 n.35.  As the Bankruptcy Court stated, separate classification is appropriate where the claims may look to different sources of recovery, have different rights against certain proceeds, or arise out of different instruments; in fact, the courts have generally treated claims based upon convertible notes (such as the CCI Notes) as a separate class from other unsecured claims based upon the conversion feature of the notes alone.[8] Based on the trial record, the Bankruptcy Court found that separate classification of the CCI Notes was justified here on a variety of grounds:

> The Plan's separate classification appears appropriate given the disparate legal rights and payment expectations of the CCI Noteholders and the CCI General Unsecured Creditors.  *See* 8/17/09 Tr. at 53:10-54:16 (Doody) (distinguishing the Class A-3 CCI General Unsecured Claims from the Class A-4 CCI Notes Claims). First, the claims of the CCI General Unsecured Creditors arise from litigation, employment, or operational relationships,

---

[8] The Bankruptcy Court wrote:

> The Debtors enjoy considerable discretion when classifying similar claims in different classes. *See In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 714, 715 (Bankr.S.D.N.Y.1992) (separate classification of similar classes was rational where members of each class "own[ed] distinct securities and possess[ed] different legal rights").

*Decision*, 419 B.R. at 264 n.35.  Moreover,

> [F]ar from being an anomaly indicative of an intent to gerrymander, bankruptcy courts administering other large chapter 11 cases have accepted separate classification of convertible note claims from general unsecured claims. *See, e.g., In re Calpine*, No. 05-60200, 2007 WL 4565223 (Bankr.S.D.N.Y. Dec. 19, 2007) (order confirming chapter 11 plan separately classifying convertible unsecured notes claims from general unsecured claims); *In re Coram Healthcare Corp.*, 315 B.R. 321, 350-51 (Bankr.D.Del.2004) (finding noteholders represented "a voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization case").

*Id.* at 266.

while claims of the CCI Noteholders arise from the holding of CCI Notes. *Id.* Significantly, the CCI are convertible into equity and structurally subordinated to the debt at all other Charter subsidiaries. *See* 6.5% Convertible Senior Notes due 2027 Indenture, dated October 2, 2007 between CCI and The Bank of New York Trust Company, N.A., CX 287, Ex. 4.7; 9/1/09 Tr. at 157:23-159:7 (McDonough) (CCI Notes were convertible and subordinated).

CCI and its noteholders also are entitled to an alternate source of recovery against Holdco that is unavailable to the CCI General Unsecured Creditors because the CCI Notes were issued in conjunction with that certain 6.50% Mirror Convertible Senior Note of Holdco due October 1, 2027 issued pursuant to the Holdco Mirror Notes Agreement, dated as of October 2, 2007, between CCI and Holdco (the "Mirror Note"). *See* 6.50% Mirror Convertible Senior Note of Holdco due October 1, 2027 issued pursuant to the Holdco Mirror Notes Agreement, dated as of October 2, 2007, between CCI and Holdco, attached as Ex. 10.3 to the CCI SEC Form 8-K, dated as of October 5, 2007, CX 306. Additionally, unlike claims of the CCI Noteholders, CCI general unsecured claims for expenses associated with CCI's duties as manager to CCO are reimbursable in full under the Management Agreement. *See* CX 305 at §§ 3(a)(i)-(ii) (including for costs to pay employees and third party providers such as vendors, attorneys, consultants, and other advisors, as well as related litigation claims). Thus, multiple material distinctions exist in the relative legal rights of the CCI Noteholders and the rights of holders of CCI general unsecured claims to justify separate classification.

*Id.* at 264-65.

The Bankruptcy Court rejected Law Debenture's argument that the Class A-3 and Class C-3 general unsecured claims were "artificially impaired" because they were not paid postpetition interest on their claims.  The Bankruptcy Court found that there was no obligation to pay holders of such claims postpetition interest, and that the Management Agreement which provided for CCO to reimburse CCI for expenses incurred in providing services to CCO contained no requirement that CCI or CCO pay vendors postpetition interest.  *Id.* at 266.

Moreover, the Bankruptcy Court found that the requirements of Bankruptcy Code section 1129(a)(10) would have been satisfied even if Classes A-3 and C-3 were not deemed to be impaired.  The Bankruptcy Court found that seven other classes of impaired creditors had accepted the Plan, and because the Plan covered a single, integrated enterprise, it was appropriate to view the Plan as a single plan covering all entities, even if the Plan did not provide for substantive consolidation:

> Notably, given the Plan's structure, the requirement of section 1129(a)(10) would be satisfied even if Classes A-3 and C-3 were not deemed to be legitimately impaired. This is so because it is appropriate to test compliance with section 1129(a)(10) on a per-plan basis, not, as the CCI Noteholders argue, on a per-debtor basis. *See In re Enron Corp.*, No. 01-16034 (Bankr.S.D.N.Y. July 15, 2004) (confirming joint chapter 11 plan where each debtor did not have an impaired accepting class); *In re SGPA, Inc.*, No. 01-02609, 2001 WL 34750646 (Bankr.M.D.Pa. Sept. 28, 2001) (same). Here, the evidence supports a finding that the business of Charter is managed by CCI on an integrated basis making it reasonable and administratively convenient to propose a joint plan. That joint Plan has been accepted by numerous other impaired accepting classes, thereby satisfying the requirement of section 1129(a)(10).

*Id.* at 266.

Finally, the Bankruptcy Court rejected Law Debenture's claim that holders of the CCI Notes were the victims of "unfair discrimination" under the Plan because they did not receive the same recoveries as holders of A-3 and C-3 Claims who had provided services to the operating companies.  The Bankruptcy Court found that the Management Agreement between CCI and CCO entitled CCI to be reimbursed for the costs of services provided by CCI and third party vendors to the operating companies; however, the Management Agreement did not act as a guaranty of payment of all of CCI's debt or the CCI Notes, in particular, a fact confirmed by the

repeated disclosure in CCI's SEC filings which stated expressly that the CCI Notes were

subordinated to all other debt.  As the Bankruptcy Court wrote:

> The argument of the CCI Noteholders regarding unfair
> discrimination is weak to the point of being meritless. The CCI
> Notes (i) are convertible into equity and structurally subordinated
> to debt at other Charter subsidiaries, (ii) enjoy an alternate source
> of recovery against Holdco that is unavailable to its general
> unsecured creditors because the CCI Notes were issued in
> conjunction with the Mirror Note, and (iii) are not entitled to
> reimbursement for expenses associated with CCI's management of
> CCO. There is no support whatsoever to the strained argument that
> claims arising under the notes should receive the same treatment as
> CCI's General Unsecured Creditors.
>
> The CCI Noteholders attempt without success to gloss over
> obvious differences in legal entitlement by noting that "[t]he
> holders of CCI Notes and the holders of CCI General Unsecured
> Claims may only recover against CCI's estate and thus are
> similarly situated." Law Debenture Trust Br. Opp'n at 49. . . .
> [T]he CCI Noteholders overlook the fact that CCI General
> Unsecured Claims for reimbursement of certain expenses are
> passed through CCI to CCO for eventual payment in full. . . . Thus,
> although CCI's general unsecured creditors and noteholders both
> have unsecured claims against CCI, creditors other than the CCI
> Noteholders have what amounts to recourse against CCO.

*Id.* at 267-68.

### 3.    Law Debenture's Claim that the Bankruptcy Court Erred in Approving the Allen Settlement

In approving the Allen Settlement, which the Bankruptcy Court reviewed with

"heightened scrutiny," the Bankruptcy Court found that the settlement met the well-established

requirements for approval of a settlement under bankruptcy law.  *Id.* at 240.  The Bankruptcy

Court found that the settlement resulted from arm's-length negotiations by a variety of

constituencies sharing the interests of creditors and the estate, that it was unanimously approved

by the independent directors of Charter's board of directors (the **"Charter Board"**), that it was

supported by the Creditors' Committee representing the interests of creditors, and, most importantly, that the settlement generated benefits for the estates which far exceeded its costs.

The Bankruptcy Court found that the Allen Settlement provided the Debtors with more than $3 billion of benefits compared with a cost of approximately $375 million.  Because the senior secured debt could not be reinstated without the agreement of Mr. Allen to continue to hold 35% of the "voting power" of the equity of the reorganized Debtors, even though he would hold only 2% of the economic value of the equity, the Allen Settlement was a necessary condition for reinstatement of the $8.1 billion of senior secured debt.  *Id.* at 252-53.  Since the Allen Settlement also provided for Mr. Allen to forebear from exercising certain exchange and other rights which would have eliminated the Debtors' NOLs and other tax benefits, the settlement preserved approximately $2.85 billion of NOLs "with an estimated cash value [to the Debtors] of over one billion dollars" as well as billions of dollars of additional tax benefits.  *Id.* at 253.[9]

---

[9] As the Bankruptcy Court wrote:

> The CII Settlement is the cornerstone of the Plan and the means by which the Debtors avoid a change of control. Reinstatement (made possible by the CII Settlement) will save the Debtors and their estates hundreds of millions of dollars in annual interest expense. 8/24/09 Tr. 16:18-17:3 (Goldstein); VDX 3 (CII Settlement: "Gives" and "Gets"). The Settlement also provides for Mr. Allen's forbearance from exercising his prepetition exchange rights and maintenance of a one percent interest in Charter Communications Holding Company, LLC ("Holdco"). This forbearance results in the Debtors' preservation of approximately $2.85 billion of NOLs, with an estimated cash value of over one billion dollars. *See* Degnan Aff. ¶ 9; 8/24/09 Tr. 16:18-17:3 (Goldstein); VDX 3 (CII Settlement: "Gives" and "Gets"). Additional aspects of the CII Settlement include the $1.6 billion rights offering, a stepped-up tax basis in a significant portion of the Debtors' assets, and the purchase of Mr. Allen's CC VIII Preferred Units. *See* VDX 3 (CII Settlement: "Gives" and "Gets"). The Debtors are receiving in excess of $3 billion in the CII Settlement. In exchange for this value, the Debtors are providing Mr. Allen with approximately $375 million. *Id.*

*Decision*, 419 B.R. at 253.

The Bankruptcy Court found that the Allen Settlement provided the Debtors with the following benefits: (i) hundreds of millions of dollars of annual interest expense savings resulting from the ability of the Debtors to reinstate their senior secured debt; (ii) $1.14 billion of cash tax savings associated with preservation of $2.85 billion of NOLs; (iii) the transfer to the Debtors of preferred units of CC VIII, an operating entity managed by Charter which had been jointly owned with CII, having a value to the Debtors of approximately $150 million; (iv) preservation of substantial additional tax benefits resulting from the agreements by Mr. Allen not to take certain actions; (v) satisfaction of a $25 million payable owed by the Debtors to CII; and (vi) the ability to consummate the $1.6 billion rights offering which was dependent upon the Allen Settlement. *Id.* at 253-54. The Bankruptcy Court wrote: "The direct and indirect value to the estate and its creditors outweighs by a high multiple the amounts allocated to Mr. Allen." *Id.* at 241. The Bankruptcy Court further wrote:

> The [Allen] Settlement is in the best interests of the Debtors estates because it (i) renders the Debtors' Plan feasible and (ii) is a reasonable settlement. The Debtors' Plan is premised on the twin goals of debt reinstatement and preservation of tax attributes. Achieving these goals required an agreement with Mr. Allen to take certain actions that he had no legal duty to perform, and to refrain from taking certain actions he was legally permitted to perform. 8/24/09 Tr. 13:20-14:14, 155:5-156:13 (Goldstein); 7/21/09 Tr. 61:5-62:6 (Millstein). Mr. Allen's agreement to hold a controlling position in Charter within the meaning of the credit agreement was necessary for the reinstatement of the Debtors' senior secured debt. *Id.* at 62:1-6. Likewise, his agreement not to exercise his exchange rights leaves the Debtors' corporate structure in place and preserves an estimated $1.14 billion in NOLs. *Id. See also* 8/24/09 Tr. 155:5-23 (Goldstein).
>
> Fundamental to the Plan is the Debtors' reinstatement of $11.4 billion in senior secured debt at favorable interest rates. Reinstating this credit facility saves the Debtors hundreds of millions of dollars in annual interest expense thereby greatly benefiting the Debtors' estates. 8/24/09 Tr. 16:18-17:3 (Goldstein). Critically, as discussed above, reinstatement depends on the agreement of Mr. Allen to

>maintain 35% of the voting power of CCI to avoid a change of control default. See Goldstein Decl. ¶ 24-25; 9/2/09 Tr. 68:17-23, 148:15-23 (Conn). The [Allen] Settlement, thus, is central to the mechanism by which the Debtors are able to reinstate their senior bank debt.
>
>The [Allen] Settlement will also enable the Debtors to achieve significant tax savings by preserving $2.8 billion of NOLs. Degnan Decl. ¶¶ 8-9; 8/24/09 Tr. 16:9-17 (Goldstein). These potential tax savings are available because the Debtors have had "substantial operating losses as a tax matter for many years." 7/21/09 Tr. 48:2-3 (Millstein). The NOLs are valuable now, because upon emergence from bankruptcy the Debtors project having positive income against which to apply their NOLs. *Id.* 48:4-15. The ability to utilize these valuable tax attributes in the future is purely a function of Mr. Allen's cooperation. 8/31/09 Tr. 184:21-24 (Johri); 7/22/09 Tr. 202:24-203:18 (Merritt); 7/21/09 Tr. 222:19-223:4, 224:2-18 (Smit); 8/17/09 Tr. 239:4-8 (Doody).
>
>The adverse impact to the Debtors if the [Allen] Settlement is not approved is real and significant. The Debtors will remain in bankruptcy, inevitably face materially higher borrowing costs, and potentially forfeit billions of dollars in tax savings. The benefits of the [Allen] Settlement far out-weigh its costs.

*Id.* at 254-55.

The Bankruptcy Court rejected the argument that the consideration paid to Mr. Allen pursuant to the settlement constituted a recovery on account of his prepetition stock interests:

>The argument of the CCI Noteholders that the [Allen] Settlement is on account of his equity in CCI and, therefore, the Plan impermissibly diverts value from CCI to Mr. Allen is unfounded. The Court is convinced, based on the evidence in the record, that the consideration to be paid to Mr. Allen is to be paid entirely on account of his concessions under the [Allen] Settlement, including his agreements to cooperate to enable the senior debt to be reinstated and to enable the Debtors' NOLs (defined below) to be preserved, his transfer of his interests in CC VIII, LLC and his compromise of various contract claims.

*Id.* at 241 n.15.

The Bankruptcy Court found that the Allen Settlement was the "product of vigorous and hard-fought" negotiations by the Debtors and by creditor constituencies, which had every interest in negotiating against Mr. Allen, was unanimously approved by the *independent* directors of the Charter Board, and was supported by both the Creditors' Committee and the Crossover Committee.  *Id.* at 241, 255-56.  The Bankruptcy Court wrote:

> The unrebutted testimony proves that the [Allen] Settlement is the product of vigorous and hard-fought three-way negotiations involving the Debtors, Mr. Allen, and the Crossover Committee. *See* 7/21/09 Tr. 55:9-12, 73:4-9 (Millstein); 7/21/09 Tr. 222:19-21, 224:1 (Smit); 8/17/09 Tr. 26:12-19 (Doody); 7/22/09 Tr. 172:19-173-5 (Merritt). These negotiations spanned more than a month, included multiple proposals and counter-proposals, and yielded concessions and modifications from all parties. *See* 8/17/09 Tr. 28:24-29:9 (Doody); 7/29/09 Tr. 210:18-211:18 (Liang).
>
> Because these discussions involved parties with clearly divergent economic interests, the negotiations were well suited to develop a practical and fair result. *See* 7/29/09 Tr. 209:24-210:8 (Liang). The outcome is thus market tested in the sense that the Crossover Committee was negotiating as an adversary with its own dollars at stake against Mr. Allen. Any value flowing to Mr. Allen from the [Allen] Settlement came directly from the Crossover Committee's pocket. *Id.* The Court is satisfied that the [Allen] Settlement represents the considered judgment of economically motivated parties who were negotiating at arm's-length to reach the best settlement that could be achieved under the circumstances.

*Id.* at 256-57.  The Bankruptcy Court further wrote:

> Importantly, the [Allen] Settlement was reviewed and approved by independent directors of Charter's board of directors who, while not members of a formal special committee, functioned as an independent group within the board. The independent directors, some of whom testified during the trial, are highly qualified individuals who had a regular practice during board meetings of convening separately from Mr. Allen and his designated directors to consider what was in Charter's best interest. These independent directors considered and approved the [Allen] Settlement and concluded unanimously that approval was in the best interest of Charter. Given the role played by the independent directors and the evidence indicating that Mr. Allen did not exert any undue

> influence over Charter in negotiating the [Allen] Settlement, the [Allen] Settlement should be evaluated under the standards applicable to approval of bankruptcy settlements in this Circuit and not under the "entire fairness" standard of Delaware law applicable to transactions with controlling insiders.

*Id.* at 241.

Finally, the Bankruptcy Court found that the Plan's releases given to Mr. Allen and certain other parties (the **"Third Party Releases"**) were fully justified under the standards applicable in this Circuit for the granting of such releases:

> Given the unusual features of the Plan, the non-debtor contributions extend well beyond the level required for a release. . . .
>
> \*       \*       \*
>
> The Debtors' estates will be receiving substantial consideration in exchange for the Third Party Releases. The [Allen] Settlement Claim Parties agreed to undertake actions to permit the reinstatement of senior secured debt at favorable interest rates and refrain from taking action that would degrade the value of the Debtors' potentially valuable NOLs. 8/17/09 Tr. 34:4-24 (Doody). Notably, while the result of the [Allen] Settlement confers billions of dollars in value on the Debtors, these are not mere financial exchanges. *See* 8/17/09 Tr. 238:9-239:8 (Doody); *see also* 7/22/09 Tr. 202:24-203:18 (Merritt). The value of the [Allen] Settlement is driven by the identity of and binding promises by the [Allen] Settlement Claim Parties. Due to these uniquely personal structuring benefits, no other party could stand in their shoes and achieve the same result. The Third Party Releases, therefore, are being granted in exchange for very substantial consideration in a rare restructuring context.

*Id.* at 258-59.

### C.    The Denials of Appellants' Motions for a Stay Pending Appeal

After filing their notices of appeal, Appellants filed emergency motions in the Bankruptcy Court for a stay of the Confirmation Order pending appeal. After briefing and argument, the Bankruptcy Court, at a hearing on November 23, 2009, denied the motions for a stay. The Bankruptcy Court found, among other things, that Appellants had failed to

demonstrate a "substantial possibility" of success on the merits of their appeals, and noted that it had rejected each of their contentions on multiple grounds and on specific findings of fact based upon the trial record.  November 23, 2009 Hearing Tr. at 49.

On November 20, 2009, Appellants filed motions for a stay pending appeal in the United States District Court for the Southern District of New York (the **"District Court"**).  At a hearing on November 25, 2009, Judge Sidney Stein denied Appellants' motions for a stay.  In his ruling, Judge Stein found that Appellants had failed to establish a substantial possibility of success on appeal:

> Let's turn to the third prong, substantial possibility of success on appeal, which requires a bit more unpacking. . . . But having reviewed the submissions and Judge Peck's findings, I conclude that neither [JPMorgan] nor [Law Debenture] has raised a "substantial possibility" of success on appeal on any of the six cumulative points of error they raise.

November 25, 2009 Hearing Tr. at 14.

## ARGUMENT

## I.

### THE APPEALS SHOULD BE DISMISSED
### ON THE GROUND THAT THEY ARE EQUITABLY MOOT

As the cases make clear, the denial of Appellants' motions for a stay pending appeal by both the Bankruptcy Court and the District Court and the closing of the Debtors' chapter 11 Plan months ago render these appeals moot under the doctrine of equitable mootness.  Accordingly, the appeals should be dismissed.

Where a party seeks to appeal an order confirming a chapter 11 plan, that party must, in order to preserve its right to appeal, seek and obtain a stay of the confirmation order pending appeal, and, if such a stay is granted, post the substantial bond that would typically be required for the stay pending appeal.  Where a party is not successful in obtaining a stay of the

confirmation order pending appeal, the cases are clear that an appeal is moot once the plan becomes effective and parties carry out the transactions contemplated by the plan.  *See*, *e.g.*, *Official Comm. of Unsecured Creditors v. SGPA, Inc. (In re SGPA, Inc.)*, 34 F. App'x 49, 52-53 (3d Cir. 2002) (failure to obtain stay of confirmation order rendered appeal moot); *In re UNR Indus.*, 20 F.3d 766, 769-70 (7th Cir. 1994) ("[A] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization."); *In re Dura Auto. Sys., Inc.*, 403 B.R. 300, 307 (D. Del. 2009) ("Where no stay has been obtained, the reorganization plan goes forward, and it is difficult to undo the acts of third parties proceeding under the plan without prejudicing those third parties."); *In re Calpine Corp.*, 390 B.R. 508, 523 (S.D.N.Y. 2008) (failure to obtain stay of confirmation order rendered appeal moot); *B & M Inv., LLC v. Calise*, 08-5736-BK, 2009 WL 4249755, at *2 (2d Cir. Nov. 30, 2009); *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 144 (2d Cir. 2005); *In re Adelphia Commc'ns Corp.*, 367 B.R. 84, 98 (S.D.N.Y. 2007) (appeal moot where movant failed to post $1.3 billion bond required by the court for stay of confirmation order pending appeal); *In re Continental Airlines*, 91 F.3d 553, 562 (3d Cir. 1996) (appeal moot where movant failed to post $450 million bond required by the court for stay of confirmation order pending appeal); *Magten Asset Mgmt. Corp. v. Northwestern Corp. (In re Northwestern Corp.)*, 04-1389, 2006 WL 2801871, at *1 (D. Del. Sept. 29, 2006) (failure to obtain stay of confirmation order rendered appeal moot); *High River Ltd. P'ship v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 01-226, 2002 WL 500569, at *2 (D. Del. Mar. 26, 2002) (same); *BNP Paribas v. Nat'l Restaurants Mgmt., Inc. (In re Nat'l Restaurants Mgmt., Inc.)*, 00 Civ. 6625, 2001 WL 220023, at *5 (S.D.N.Y. Mar. 7, 2001) (appeal moot where appellant fails to post required bond or seek stay of confirmation order); *Adiel v. The Pharmacy*

*Fund, Inc.*, 00 Civ. 3273, 2000 WL 1206742, at *3 (S.D.N.Y. Aug. 23, 2000) (failure to obtain

stay of confirmation order rendered appeal moot); *Griffin v. Box Bros. Holding Co. (In re Box*

*Bros. Holding Co.)*, 194 B.R. 32, 41 (D. Del. 1996) (same); *Trans World Airlines, Inc. v. Texaco,*

*Inc. (In re Texaco, Inc.),* 92 B.R. 38, 46 (S.D.N.Y. 1988) (appeal of confirmation order presumed

moot where movants fail to or are unable to obtain a stay); *accord In re Enron Corp.*, 326 B.R.

497, 502 (S.D.N.Y. 2005); *In re Delta Airlines, Inc.*, 386 B.R. 518, 539-40 (Bankr. S.D.N.Y.

2008) ("***Delta I***") (failure to obtain stay of confirmation order rendered appeal moot).[10]

Under the doctrine of equitable mootness, "an appeal should be dismissed when,

'even though effective relief could conceivably be fashioned, implementation of that relief would

be inequitable.'" *Adelphia*, 367 B.R. at 91 (citing *Official Comm. of Unsecured Creditors of*

*LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re*

*Chateaugay Corp.) ("**Chateaugay I**")*, 988 F.2d 322, 325 (2d Cir. 1993)).  The doctrine "furthers

the principle that 'the ability to achieve finality is essential to the fashioning of effective

remedies.'"  *Id.* (quoting *Chateaugay I*, 988 F.2d at 325).

Due to the impossibility of undoing a plan of reorganization after it has been

consummated, an order confirming a chapter 11 plan is equitably moot once the plan has been

"substantially consummated" *or* there has been a "substantial change of circumstances" in

reliance upon the plan.  *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) (quoting

*Chateaugay I*, 988 F.2d at 325); *Texaco*, 92 B.R. at 46 (quoting *Lawrence v. Revere Copper and*

*Brass Inc. (In re Revere Copper and Brass Inc.)*, 78 B.R. 17, 21 (S.D.N.Y. 1987)) ("[I]t is

inherently improbable, once there has been 'substantial consummation,' that an appellate court

---

[10] *See also Ad Hoc Comm. of Kenton County Bondholders v. Delta Air Lines, Inc.*, 309 F. App'x. 455, 456 (2d Cir. 2009) (appeal of settlement order moot due to subsequent "irreversible financial transactions" following denial of stay pending appeal).

will be able to fashion effective relief."); *Delta I*, 386 B.R. at 537 (citing *Metromedia*, 416 F.3d at 143; *Continental*, 91 F.3d at 560).

Here, *each* of the foregoing thresholds for a finding of equitable mootness is met: the Plan has been fully consummated and hundreds of transactions, including a $1.6 billion Rights Offering, have been consummated in reliance upon the Plan.  Under section 1101 of the Bankruptcy Code, a plan is deemed to have been "substantially consummated" upon (i) the transfer of substantially all of the property proposed by the plan to be transferred, (ii) the reorganized debtors' assumption of the debtors' business, and (iii) commencement of distribution under the plan – all of which, and more, have occurred here.  11 U.S.C. § 1101(2).  Where a plan has been substantially consummated, there is a presumption of equitable mootness with respect to any challenge to the order confirming the plan.  *Adelphia*, 367 B.R. at 91; *In re Delta Airlines, Inc.*, 374 B.R. 516, 522 (S.D.N.Y. 2007) ("**_Delta II_**").

There can be no serious dispute that the Plan has been substantially consummated, that the consummation of the Plan has resulted in a "comprehensive change of circumstances," and that any effort to undo or revise the Plan would be inequitable.  The Charter Plan involved many billions of dollars worth of creditor claims that have been settled, a $1.6 billion Rights Offering, and a transfer of the Debtors' operations to the reorganized Debtors.  Since the Plan's closing, the reorganized Debtors have operated the Debtors' businesses and have undertaken thousands of transactions (in addition to many transactions by creditors, vendors, and other third parties with the reorganized Debtors).  Consummation of the chapter 11 Plan involved numerous transactions which cannot be undone, including:

- the $1.6 billion Rights Offering that closed many months ago and the issuance of approximately 88.7 million shares of new Class A common stock ("**New Class A Stock**") pursuant thereto;

- the conversion of CCH I notes into approximately 21.1 million shares of New Class A Stock under the Plan;

- reinstatement of the $8.1 billion of senior secured debt;

- implementation in full of the Allen Settlement;

- issuance of more than one million membership units of HoldCo to Mr. Allen;

- the exchange of CCH II notes for approximately $1.77 billion of new CCH II notes;

- issuance of warrants to holders of CCH notes, CIH notes, and Mr. Allen, to allow them to purchase, in the aggregate, approximately 12.7 million shares of New Class A Stock;

- issuance of approximately 5.5 million shares of preferred stock to holders of CCH II notes;

- payment of approximately $938.4 million to holders of old CCH II notes;

- distribution to many tens of thousands of creditors of distributions to be made under the Plan;

- the assumption and performance of executory contracts under the Plan;

- the transfer of the Debtors' assets under the Plan to the reorganized Debtors, and the filing and implementation of new corporate governance documents governing the reorganized Debtors' businesses;

- the appointment of new officers and directors for the reorganized Debtors and their governance of the Debtors' businesses;

- other transactions contemplated by the Plan or undertaken in reliance thereon.

These transactions evidence "substantial consummation" of the Plan *and* a "comprehensive change in circumstances," each of which mandates dismissal of the appeal as equitably moot. *See In re Source Enters., Inc.*, 392 B.R. 541, 548-549 (S.D.N.Y. 2008); *Calpine*, 390 B.R. at 518; *Adelphia*, 367 B.R. at 91; *Delta II*, 374 B.R. at 522-23. Moreover, since the effective date of the Plan, the equity and debt of the reorganized Debtors have traded in the public markets in reliance upon the finality of the Plan.

If a plan of reorganization has been substantially consummated, the presumption of mootness may be rebutted only if the moving party demonstrates the presence of *all* of the following five factors:  (1) the court can still order some effective relief; (2) such relief will not

affect the re-emergence of the debtor as a revitalized corporate entity; (3) such relief will not

unravel intricate transactions so as to knock the props out from under the authorization for every

transaction that has taken place and create an unmanageable, uncontrollable situation for the

bankruptcy court; (4) the parties who would be adversely affected by the modification have

notice of the appeal and an opportunity to participate in the proceedings; and (5) the appellant

pursued with diligence all available remedies to obtain a stay of execution of the objectionable

order.  *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)* (**"*Chateaugay II*"**), 10 F.3d

944, 952-53 (2d Cir. 1993); *Adelphia,* 367 B.R. at 92 (quoting *In re Loral Space & Commcn's

Ltd.*, 346 B.R. 71, 72 (S.D.N.Y. 2006)).  *See also, Delta II*, 374 B.R. at 523 (citing *Kassover v.

Gibson*, 02 Civ. 7978, 2003 WL 21222341, at *2 (S.D.N.Y. May 27, 2003), *aff'd*, 98 F. App'x.

30 (2d Cir. 2004); *Allstate*, 174 B.R. at 889).

   Appellants cannot show that the factors necessary to rebut the presumption of

equitable mootness are present.  The Plan cannot be undone; thousands of transactions have

taken place in reliance upon it, numerous parties have relied upon the finality of the Plan, and it

would be inequitable to now rewrite or refashion the Plan.  Even if such relief were available,

granting that relief would "unravel intricate transactions so as to knock the props out from under

the authorization for every transaction that has taken place and create an unmanageable,

uncontrollable situation for the Bankruptcy Court."  *Chateaugay II*, 10 F.3d at 953; *see also

Adelphia*, 367 B.R. at 97; *Delta I*, 386 B.R. at 538 (finding it impossible to undo transactions that

took place in reliance upon the reorganization plan); *Metromedia*, 416 F.3d at 144; *UNR*, 20 F.3d

at 769-70; *Dura*, 403 B.R. at 307 ("Where no stay has been obtained, the reorganization plan

goes forward, and it is difficult to undo the acts of third parties proceeding under the plan

without prejudicing those third parties."); *Texaco*, 92 B.R. at 46 (quoting *In re AOV Indus., Inc.*,

792 F.2d 1140, 1149 (D.C. Cir. 1986)) ("[T]he 'piecemeal dismantling of the Reorganization

Plan in subsequent appeals of individual transactions' is, in practical terms if nothing else, a

virtually impossible task."); s*ee also Kenton County*, 309 F. App'x. at 456 (finding appeal of

order approving a settlement equitably moot where "irreversible financial transactions . . .

occurred" following denial of a stay pending appeal); *Chateaugay I*, 988 F.2d at 326; *BDC*

*Finance, L.L.C. v. Metaldyne Corp. (In re Metaldyne Corp.)*, 421 B.R. 620, 626 n.4 (S.D.N.Y.

2009) (failure to obtain a stay of sale order allowed a comprehensive change in circumstances to

take place); *In re Global Vision Prods., Inc.*, 09 Cv. 374, 2009 WL 2170253, at *4 (S.D.N.Y.

July 14, 2009) (finding that an unstayed order approving a settlement agreement resulted in a

comprehensive change in circumstances); *Kassover*, 2003 WL 21222341, at *2 (quoting *Revere*

*Copper*, 78 B.R. at 23).

      For the foregoing reasons, the Court should dismiss Law Debenture's and R$^2$'s

appeals as equitably moot.

## II.

### LAW DEBENTURE'S ARGUMENT THAT THE BANKRUPTCY COURT ERRED IN FINDING THAT THE PLAN COMPLIED WITH SECTION 1129(A)(10) OF THE BANKRUPTCY CODE SHOULD BE REJECTED

      The applicable standards for review of a Bankruptcy Court's findings of fact are

well-established; those findings may be set aside only for clear error.  *See* Fed. R. Bankr. P.

8013; *In re Best Prods. Co., Inc.*, 68 F.3d 26, 29 (2d Cir. 1995).  Under the clear error standard,

"there is a strong presumption in favor of a trial court's findings of fact if supported by

substantial evidence.  [A court on appeal] will not upset a factual finding unless [it is] left with

the definite and firm conviction that a mistake has been committed."  *Travellers Int'l, A.G. v.*

*Trans World Airlines, Inc.*, 41 F.3d 1570, 1574-75 (2d Cir. 1994).

Law Debenture contends that the Bankruptcy Court erred in finding that the Plan complied with section 1129(a)(10) of the Bankruptcy Code, which provides that if a class of claims is impaired in a plan, at least one class of impaired claims must accept the plan. Specifically, Law Debenture argues although the Plan was accepted by ten impaired classes of claims, these classes were (i) "artificially gerrymandered" and (ii) "artificially impaired" for the purposes of obtaining an impaired class and therefore should not be counted for the purposes for satisfying the requirements of section 1129(a)(10). Law Debenture's contentions are without merit.

### A.   The Separate Classification of CCI General Unsecured Claims Was Proper

The Bankruptcy Court correctly found that the separate classification of the CCI Noteholders and CCI General Unsecured Claims was proper. *Decision*, 419 B.R. at 264. As a preliminary matter, the law is clear that a debtor enjoys "considerable discretion" in classifying similar claims in different classes where there is a rational basis for doing so. *Id.* at 264 n.35. *Accord Boston Post Road L.P. v. FDIC (In re Boston Post Road, L.P.)*, 21 F.3d 477, 483 (2d Cir. 1994) (finding that courts cannot prohibit separate classification of substantially similar claims); *Chateaugay II*, 10 F.3d at 956-57 (finding separate classification based on bankruptcy court-approved settlement appropriate because classification scheme had a rational basis); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (allowing a plan proponent to group similar claims in different classes); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (finding that although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case."); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped

together."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177-78 (Bankr. S.D.N.Y. 1989) ("A debtor may place claimants of the same rank in different classes and thereby provide different treatment for each respective class").  In this regard, courts have made clear that separate classification is justified where, as here, claims have different legal rights, sources of recovery, *or* the claims arise out of different instruments.  Here, each of the foregoing bases for separate classification was present.

The CCI General Unsecured Claims arise from litigation, employment, or operational relationships.  The CCI Noteholders' claims are based on the CCI Notes, which were convertible into equity and are also structurally subordinated to the debt of Charter's subsidiaries.  Chapter 11 plans routinely classify unsecured notes separately from general unsecured claims and this is all the more reasonable where, as here, the unsecured notes are convertible notes with an equity upside not available to general unsecured creditors.  *See, e.g., In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007) (order confirming chapter 11 plan separately classifying convertible unsecured notes claims from general unsecured claims); *In re Tower Automotive, Inc.,* No. 05-10578 (Bankr. S.D.N.Y. July 12, 2007) (same); *In re Global Crossing Ltd.*, No. 02-40188 (Bankr. S.D.N.Y. Dec. 26, 2002) (order confirming chapter 11 plan separately classifying unsecured notes claims from general unsecured claims); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 350-51 (Bankr. D. Del. 2004) (finding noteholders represented "a voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization case").

Separate classification was further appropriate because the CCI General Unsecured Claims were covered by the Management Agreement, whereas the CCI Notes claims were not. The Management Agreement was a contract between CCI and CCO for CCI to manage CCO.

Pursuant to the Management Agreement, CCI provides certain management services to CCO and the operating entities in return for reimbursement at cost for expenses incurred in providing such services.  The CCI Notes, on the other hand, were issued as part of a financing transaction *unrelated* to CCI's management duties or the administrative costs; and thus not reimbursable under the Management Agreement.  Contrary to the assertions now made by Law Debenture, the unrebutted evidence at trial established that the Management Agreement was not intended to be, nor was it, a guaranty of the CCI Notes.  Indeed, as the evidence at trial made clear, Charter's SEC filings consistently and repeatedly disclosed that the CCI Notes were subordinated to the claims of all other debt, and nowhere in the offering documents for the CCI Notes or in the SEC filings was there any statement even suggesting that the CCI Notes were guaranteed by the operating subsidiaries or any other entity.  *See Decision*, 419 B.R. at 265 (citing 6.5% Convertible Senior Notes due 2027 Indenture, dated October 2, 2007, between CCI and The Bank of New York Trust Company, N.A., CX 287; Ex. 4.7; 9/1/09 Tr. at 157:23-159:7 (McDonough) (CCI Notes were convertible and subordinated)).[11]  As Charter disclosed in SEC filings when it exchanged the CCI Notes in 2007, the CCI Noteholders do "not have any recourse against [Holdco], Mr. Allen or any of [Charter's] affiliates,"[12] including recourse against its affiliate CCO.  The claim made by Law Debenture on this appeal that the CCI Notes were guaranteed by the Management Agreement was not even seriously argued, let alone proven, at trial.

---

[11] *See also* Form S-4 of Charter Communications, Inc. dated August 29, 2007 ("**Form S-4**"), *available at* http://www.sec.gov/Archives/edgar/data/1091667/000095012307012066/y38890sv4.htm ("The New Notes will be unsecured and unsubordinated obligations and will rank, in right of payment, the same as all of Charter's existing and future senior unsecured indebtedness, including the Old Notes. The New Notes will rank senior in right of payment to any future subordinated indebtedness of Charter and will be effectively subordinated to any of Charter's secured indebtedness and structurally subordinate to indebtedness and other liabilities of Charter's subsidiaries."); Amendment No. 1, dated September 14, 2007, to Form S-4, *available at* http://www.sec.gov/Archives/edgar/data/1091667/000095012307012605/y38890a1sv4za.htm (same).

[12] Form S-4, at 28.

For the foregoing reasons, separate classification of the CCI General Unsecured Claims and the claims of the CCI Noteholders clearly was proper.

### B.      The CCI General Unsecured Claims Were Impaired

Law Debenture's claim that the CCI General Unsecured Claims were artificially impaired for the purposes of creating an impaired accepting class is also without merit.  Pursuant to the Plan, CCI General Unsecured Claims were reinstated or paid in full, but did not receive postpetition interest.  Moreover, as the Bankruptcy Court found, there was no requirement under the Management Agreement that CCI or CCO pay postpetition interest on any such claims.  *Id.* at 266 n.39.

The law is clear that unsecured creditors of an insolvent debtor are not entitled to postpetition interest, and that that is more than sufficient to render them impaired; indeed, holders of claims which do not receive postpetition interest have an absolute right to be treated as impaired under a plan.  *See United Savings Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 372-73 (1988); *Int'l Asset Recovery Corp. v. Thomson McKinnon Secs. Inc.*, 335 B.R. 520, 527 (S.D.N.Y. 2005); *In re Chateaugay Corp.*, 156 B.R. 391, 403-04 (S.D.N.Y. 1993); *In re Amster Yard Assocs.*, 214 B.R. 122, 123 (Bankr. S.D.N.Y. 1997) ("The unsecured creditors are also impaired because they will receive 100% of their claims without postpetition interest."); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 239 n.30 (Bankr. D.N.J. 2000).

The Plan did not improperly classify claims and the CCI General Unsecured Claims were not "artificially impaired."

C.     **The Requirements of Section 1129(a)(10) Were Also Met Because There Were Nine Impaired Classes Voting in Favor of the Plan**

Even apart from the votes of the general unsecured classes of CCI in favor of the Plan, the Plan was properly approved because there were some seven other impaired classes which voted in favor of the Plan.

As the Bankruptcy Court found, Charter was a single integrated enterprise and the Plan covered all Charter entities.  By its terms, section 1129(a)(10) requires only that a single impaired class under the entire plan vote in favor of confirmation.  Section 1129(a)(10) is a per-plan requirement, not a per-debtor requirement.  Thus, section 1129(a)(10) states, in pertinent part, that "[i]f a class of claims is impaired under the plan, at least one class of claims *that is impaired under the plan* has accepted the plan."  11 U.S.C. § 1129(a)(10) (emphasis added).  This provision looks to all classes impaired "under the plan."  *See In re SPA, Inc.*, Case No. 1-01-02609, 2001 WL 34750646, at *7 (Bankr. M.D. Pa. Sept. 28, 2001) ("I agree with Debtors' position that in a joint plan of reorganization it is not necessary to have an impaired class of creditors of each Debtor vote to accept the Plan."); *In re Enron Corp.*, No. 01-16034, 2004 Bankr. LEXIS 2549, at *236 (Bankr. S.D.N.Y. July 15, 2004) ("It is quite common for debtors with a complex corporate structure to file a joint chapter 11 plan pursuant to which the corporate form is preserved, *or* in which a 'deemed consolidation' is proposed and approved.  In such circumstances, all debtors are treated as a single entity for voting and distribution purposes.").

### III.

### LAW DEBENTURE'S CLAIM THAT THE CCI NOTEHOLDERS WERE ENTITLED TO THE VALUE OF THE NOLS GENERATED BY THE OPERATING COMPANIES AND THAT THE PLAN VIOLATED THE ABSOLUTE PRIORITY RULE ARE WITHOUT MERIT

Section 1129(a)(7) of the Bankruptcy Code provides that, in order for a chapter 11 plan to be confirmed, creditors in an impaired class which has not voted to accept the plan must receive

value under the plan "that is not less than the amount that such holder[s] would . . . receive if the debtor were liquidated under chapter 7 [of the Code]."  11 U.S.C. § 1129(a)(7).  Put differently, the non-consenting impaired class must receive a recovery which is not less than what it would have received in a chapter 7 liquidation.  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that a plan of reorganization satisfies section 1129(a)(7) of the Bankruptcy Code where the holder of an impaired claim receives "no less than such holder would receive in a hypothetical chapter 7 liquidation").

As the Bankruptcy Court found, Charter's Plan not only provided the holders of the CCI Notes with what they were entitled to receive under section 1129(a)(7), but it provided them with considerably in excess of that amount.  Under the Plan, holders of the CCI Notes received a recovery of 32.7% of the amount of their claims, substantially in excess of the recovery of 18.4% which they would have received in a chapter 7 liquidation.

Notwithstanding this, Law Debenture contends that the CCI Noteholders were entitled to receive a greater recovery on their claims because (i) the CCI Noteholders were allegedly entitled to the "value" of the NOLs generated by the Charter operating subsidiaries, and (ii) the value of the NOLs was allegedly transferred to junior creditors or to equityholders in violation of the absolute priority rule under Bankruptcy Code section 1129(b).  Each of these claims should be rejected.

### A.        The CCI Noteholders Were Not Entitled to the "Value" of the NOLs

Contrary to Law Debenture's claims, the cases are clear, and they are uniform, in holding that, for bankruptcy and distribution purposes, the value of NOLs generated by operating subsidiaries of a parent company belongs to the operating companies which generated the NOLs, not to the parent corporation.  The law is equally clear that NOLs have no value to a parent

company which generates no revenues and income, and that creditors of the parent have no right

or claim to the value of such NOLs.

First, the law is clear that NOLs belong to the operating entity which generated them, not

to a parent corporation.  *See, e.g., In re Prudential Lines, Inc.*, 928 F.2d 565, 569-70 (2d Cir.

1991) (affirming order enjoining parent corporation from taking a worthless stock deduction

which would use up NOLs generated by the debtor operating subsidiary and interfere with debtor

subsidiary's use of NOLs generated as a result of subsidiary's operations); *Nisselson v. Drew*

*Indus., Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 424 (Bankr.

S.D.N.Y. 1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of

the estate of the loss corporation that generated them.").  As the courts have held, the fact that the

parent files consolidated returns on behalf of a consolidated group, that it reports income on

behalf of the operating companies, or that it is the party which receives a refund from the IRS,

does not mean that the parent is the owner of the NOLs:

> The fact that a subsidiary's NOL ultimately may be used to offset
> another corporation's income does not mean that the subsidiary loses
> any interest in its NOL.  The common parent acts as an agent on behalf
> of all the members of the consolidated group 'for the convenience and
> protection of [the] IRS only.'  *Jump v. Manchester Life & Casualty*
> *Management Corp.*, 579 F.2d 449, 452 (8th Cir. 1978); *accord In re*
> *Bob Richards, supra,* 473, F.2d at 265.  The corporations retain their
> separate identities and the property interests of the subsidiaries are not
> absorbed by the common parent.  *Wolter Constr. Co., Inc. v.*
> *Commissioner,* 634 F.2d 1029, 1038 (6th Cir. 1980).  It follows that a
> corporation does not lose any interest it had in the right to use its NOL
> to offset income because of its status in a group of affiliated
> corporations that file a consolidated tax return.

*Prudential Lines*, 928 F.2d at 571.

Because the subsidiaries that generate the operating losses, not a parent entity, are

entitled to the benefit of operating losses for bankruptcy purposes, neither the parent nor its

creditors is entitled to claim ownership of or use the NOLs or to take any action which might

affect the right of the operating companies which generated the NOLs to use the NOLs in the future. *Id.* at 571 (affirming injunction enjoining parent from taking actions which would interfere with debtor subsidiary's future use or benefit from NOLs).

Even if the NOLs or a portion of the NOLs did "belong" to CCI for bankruptcy purposes — which they did not — the Bankruptcy Court properly found, based upon the evidence presented at trial, that the NOLs would have no use or value to CCI because CCI has no income or operations of its own. *Decision*, 419 B.R. at 263 (citations omitted); *see also Maytag Corp. v. Navistar Int'l Transp. Corp.*, 219 F.3d 587, 590-91 (7th Cir. 2000) ("Tax attributes cannot be sold or given away; only the company that generated the losses may use them. When the bankruptcy wrapped up, accumulated tax losses were a major asset of the estate. It would have been folly to throw them away, as a liquidation would have done."). Moreover, under section 1129(a)(7) of the Bankruptcy Code, the obligation of the Debtors under the Plan was to give the CCI Noteholders, as a non-accepting class, the same value that they would have received in a hypothetical chapter 7 liquidation; however, as the Bankruptcy Court found, in such a liquidation, the CCI Noteholders would have received no value from the NOLs since CCI is not an operating company and does not produce any income of its own against which the NOLs could be utilized. *Decision*, 419 B.R. at 263.

### B.   Law Debenture's Argument that the Plan Violated The Absolute Priority Rule Is Without Merit

Under the absolute priority rule embodied in section 1129(b)(1) of the Bankruptcy Code, a plan may not transfer the value of an entity's assets to junior creditors of the entity before senior creditors of the entity are paid in full, absent consent of the senior class of creditors. 11 U.S.C. § 1129(b)(1).

Law Debenture's claim that the Plan violated the absolute priority rule because the Plan transferred the "value" of the NOLs from CCI to other entities or their creditors is unfounded because the NOLs were not generated by CCI and did not belong to CCI for bankruptcy purposes.  Also unfounded is the suggestion that some value was transferred to equityholders. The Plan expressly cancelled all prepetition equity with no distribution, as the Bankruptcy Court found.  Confirmation Order, at I.M.1(viii)(b) ("The [Allen] Settlement . . . does not violate the absolute priority rule.").

<div align="center">

**IV.**

**APPELLANTS' CLAIM THAT THE BANKRUPTCY COURT ERRED IN APPROVING THE ALLEN SETTLEMENT SHOULD BE REJECTED**

</div>

Appellants contend that the Bankruptcy Court erred in approving the Allen Settlement. They also argue that, in approving the settlement, the Bankruptcy Court erred in not applying the "entire fairness" standard applicable under Delaware law to judicial review of a transaction between a corporation and its controlling shareholder.  Those claims should be rejected.

**A.       The Bankruptcy Court Properly Approved the Allen Settlement**

As the Bankruptcy Court properly found, the Allen Settlement was the result of hard-fought, arms-length negotiations between the Paul Allen Group, the Crossover Committee representing the major bondholder constituencies which largely funded the settlement through the Rights Offering, and the Debtors.  The settlement was unanimously approved by the independent directors of the Charter Board, was strongly supported by the Creditors' Committee, which represents the creditors of the chapter 11 estates, and by the Crossover Committee, and was thoroughly reviewed and approved by the Bankruptcy Court which, after a 19-day trial, found that the settlement was overwhelmingly in the best interests of the Debtors, the estates,

and creditors.  As the Bankruptcy Court found, the Allen Settlement provided the Debtors with billions of dollars of benefits, far exceeding the costs of the settlement to the chapter 11 estates.

There can be little dispute that the Allen Settlement was in the best interests of creditors and the estates.  The Plan could not have been confirmed without the settlement.  The settlement provided the estates with billions of dollars of benefits, including: (i) the ability to reinstate the $8.4 billion of senior debt; (ii) preservation of the Debtors' NOLs valued at more than $2.8 billion; (iii) preservation of billions of dollars of other tax benefits which will result from the Debtors' ability to "step up" the tax bases of their assets; (iv) the transfer by CII, an entity controlled by Mr. Allen, to the Debtors of CII's preferred stock interests in CC VIII, a jointly owned entity, which alone had a value to the Debtors of approximately $135-165 million; and (v) the transfer of other assets, rights, and claims from the Paul Allen Group to the Debtors. *Decision*, 419 B.R. at 253-54.

The applicable standards for the approval of a bankruptcy settlement are well-established. Whether a settlement is proposed as part of a chapter 11 plan, or as an independent settlement outside of a plan, approval of the settlement is governed by rule 9019 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rule 9019**").  *See, e.g.*, *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478 F.3d 452, 462 (2d Cir. 2007).  The Bankruptcy Court may approve a settlement under Bankruptcy Rule 9019 if the settlement is fair and equitable and is in the best interests of the estate.  *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25 (1968).  Under the case law of this and other circuits, the bankruptcy courts look to the criteria enumerated by the Second Circuit in the *Iridium* decision to determine whether the settlement should be approved.[13]

---

[13] As the Court held in *Iridium*, the applicable factors by which a settlement is to be evaluated are as follows:

In reviewing a settlement, the court must "canvass the issues raised by the parties" and determine whether the settlement is reasonable in light of the *Iridium* factors. *In re Teltronics Servs., Inc.,* 762 F.2d 185, 189 (2d Cir. 1985); *In re Stone Barn Manhattan LLC,* 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009). The *Iridium* standard does not require that the settlement be the very best the debtor could have obtained, but rather that the settlement does not "fall below the lowest point in the range of reasonableness." *Teltronics Servs.*, 762 F.2d. at 189; *In re Adelphia Commc'ns Corp.,* 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005), *adhered to on reconsideration,* 327 B.R. 175 (Bankr. S.D.N.Y. 2005), *and aff'd,* 337 B.R. 475 (S.D.N.Y. 2006), *aff'd,* 224 F. App'x. 14 (2d Cir. 2006). Moreover, while the "approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored." *Stone Barn,* 405 B.R. at 75 (internal citations omitted).

After a 19-day trial during which the Bankruptcy Court applied the closest scrutiny to the Allen Settlement, the Bankruptcy Court found that the *Iridium* standards clearly were met. As the Bankruptcy Court wrote, "[t]he [Allen] Settlement brings enormous value to the estate and increases the recoveries for creditors generally." *Decision*, 419 B.R. at 255. Every major constituency in the chapter 11 case, save Appellants seeking a greater recovery for themselves, supported the Allen Settlement. Creditors overwhelmingly supported it in the Plan. The Allen

---

(1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, 'with its attendant expense, inconvenience, and delay,' including the difficulty in collecting on the judgment; (3) 'the paramount interests of the creditors,' including each affected class's relative benefits 'and the degree to which creditors either do not object to or affirmatively support the proposed settlement'; (4) whether other parties in interest support the settlement; (5) the 'competency and experience of counsel' supporting, and '[t]he experience and knowledge of the bankruptcy court judge' reviewing, the settlement; (6) 'the nature and breadth of releases to be obtained by officers and directors'; and (7) 'the extent to which the settlement is the product of arm's length bargaining.'

*Iridium*, 478 F.3d at 462 (*quoting In re WorldCom, Inc.,* 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).

Settlement was clearly in the best interests of creditors and the estates and was properly approved.

### B.    Appellants' Claim that the Bankruptcy Court Erred in Not Applying the "Entire Fairness" Standard Under Delaware Law

Appellants contend that, in addition to applying the standards for approval of a settlement under Bankruptcy Rule 9019 and the *Iridium* factors, the Bankruptcy Court should have applied the "entire fairness" standard applicable under Delaware law to judicial review of a settlement between a company and its principal shareholder.  Appellants contend that the Bankruptcy Court was required to apply the "entire fairness" standard applicable under Delaware law because section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan "has been proposed in good faith and not by any means forbidden by law."  Appellants' argument is misplaced.

At the outset, Appellants ignore the fundamental distinction between a bankruptcy settlement and a settlement between a company and its principal shareholder outside of bankruptcy.  In a bankruptcy case, settlements are subject to exhaustive review by a variety of constituencies *and* approval by the bankruptcy court under the standards applicable under Bankruptcy Rule 9019.  This is true regardless of whether the settlements are part of a reorganization plan or are made pursuant to a separate motion.  *See Resolution Trust Co. v. Best Prods. Co., Inc. (In re Best Prods. Co., Inc.)*, 177 B.R. 791, 794 (S.D.N.Y. 1995).  In bankruptcy, a settlement is reviewed and may be objected to in the Bankruptcy Court by the creditors' committee, which is appointed to represent the interests of all creditors; any additional committees which may have been formed, such as the Crossover Committee; the independent directors and officers of the debtors, who owe fiduciary duties to creditors and the bankruptcy court under the provisions of the Bankruptcy Code; the Office of the United States Trustee; and individual creditors.  *Iridium*, 478 F.3d at 461-62.  By contrast, a settlement outside of

bankruptcy requires no judicial approval.  In short, a bankruptcy settlement has little relation to an out-of-court settlement between a company and its principal shareholder, and is subject to the most rigorous review under the federal standards embodied in Bankruptcy Rule 9019 and the applicable case law.

As the Bankruptcy Court found, there is no requirement that a bankruptcy settlement, in addition to meeting the requirements under Bankruptcy Rule 9019, meet different requirements under state law, such as the "entire fairness" standard.  Nor was the Delaware "entire fairness" standard even applicable, since the record unmistakably established that the settlement was negotiated by the Crossover Committee and the independent directors, and did not result from a negotiation between Mr. Allen and persons under his direction.  As the Bankruptcy Court wrote:

> First, the "entire fairness" standard does not apply in light of the record showing that the negotiations that resulted in the settlement were initiated by Lazard for the benefit of the enterprise, not by Mr. Allen for his benefit, and that the settlement was approved by independent members of Charter's board. Second, even if the "entire fairness" standard were applicable, the plain language of section 1129(a)(3) does not require that the Plan's contents comply "in all respects with the provisions of all nonbankruptcy laws and regulations" because it "speaks only to the proposal of a plan ..." *In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 59 (Bankr.S.D.N.Y.1990), quoting 5 Collier on Bankruptcy, ¶ 1129.02, 129-23 (15th ed.); *In re General Dev. Corp.,* 135 B.R. 1002, 1007 (Bankr.S.D.Fla.1991) (holding that proposed plan satisfied Bankruptcy Code section 1129(a)(3) even if its distribution of stock to the objecting municipalities could be construed to violate the Florida Constitution).

*Decision*, 419 B.R. at 261.

Appellants' contention that the provisions of a settlement which is incorporated into a chapter 11 plan must not only meet the requirements under Bankruptcy Rule 9019, but must also meet the "entire fairness" standard, is unfounded.

First, contrary to Appellants' arguments, Bankruptcy Code section 1129(a)(3), by its terms, requires only that a plan has not been *proposed* by any means "forbidden by law," such as

collusive bidding, unlawful payments, or other illegal conduct.  Under section 1129(a)(3), the

*proposal* of the plan must not be by any means forbidden by law; the provision does not mean

that the *content* of the plan, such as a settlement which is incorporated into the plan, must

comply with the provision of any and every state law which might be applicable outside of

bankruptcy.  *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 59-60 (Bankr. S.D.N.Y. 1990)

("there is no requirement imposed by [section] 1129(a) that the contents of a plan comply in all

respects with the provisions of all non-bankruptcy laws and regulations.  'Section 1129(a)(3)

speaks only to the proposal of a plan.'") (internal citations omitted); *see also In re General Dev.*

*Corp.*, 135 B.R. 1002, 1007 (Bankr. S.D. Fla. 1991) (same); *In re Sovereign Group, 1984-21*

*Ltd.*, 88 B.R. 325, 331 (Bankr. D. Colo. 1988) ("[A]n examination of the meaning of [section]

1129(a)(3)] indicates that [its] purpose . . . was to ensure that the *proposal* of a plan of

reorganization was to be done in good faith and not in a way that was forbidden by law.")

(emphasis in original); *In re Frascella Enters., Inc.*, 360 B.R. 435, 445 n.25 (Bankr. E.D. Pa.

2007) (quoting *In re Food City, Inc.*, 110 B.R. 808, 812 (Bankr. W.D. Tex. 1990))

("Confirmation is not intended to provide a 'clean bill of health' with regard to all laws with

which a given plan might conceivably conflict.").  Likewise, the section's requirement that the

proposal of a plan be "not by any means forbidden by law" refers to the *manner* by which the

plan at issue is proposed to the court and interested parties, *not* the manner by which the plan

proponents went about creating the plan.  *See Food City*, 110 B.R. at 811-12 (*quoting Sovereign*

*Group*, 88 B.R. at 328) ("[T]he focus of 1129(a)(3) is upon the conduct manifested in obtaining

the confirmation votes of a plan of reorganization and not necessarily on the substantive nature

of the plan."); *Kaiser Aerospace & Elec. Corp. v. Teledyne Indus. (In re Piper Aircraft Corp.)*,

244 F.3d 1289, 1300 n.7 (11th Cir. 2001), *cert. denied*, 534 U.S. 827, 122 S. Ct. 66, 151 L. Ed.

2d 33 (2001) (refusing to consider allegations of the plan proponent's breach of contract and breach of fiduciary duty because they were beyond the scope of section 1129(a)(3)).

Moreover, Appellants' contention that settlements embodied in a chapter 11 plan must meet the "entire fairness" standard, if accepted, would mean that settlements incorporated in a chapter 11 plan must meet one standard of review, whereas the same settlements proposed as independent settlements outside of a chapter 11 plan would be reviewed under a different standard.  Bankruptcy settlements can be, and generally are, proposed outside of a plan of reorganization.  In each case, they are subject to review under the standards of Bankruptcy Rule 9019 and the cases thereunder.  Under the Appellants' interpretation of section 1129(a)(3), a settlement incorporated in a chapter 11 plan would be subject to review under the standard of whatever state law might apply, whereas the very same settlement outside of a plan would not. Not only would such a result make little sense, but the cases have held that settlements that are part of a chapter 11 plan are to be measured by the very same Bankruptcy Rule 9019 standard as settlements proposed outside of a chapter 11 plan.  *See, e.g., Iridium*, 478 F.3d at 462; *Best Prods.*, 177 B.R. at 794.

Finally, as the cases have held, section 1129(a)(3) regulates the manner in which a chapter 11 plan is proposed; it does not set up substantive standards for review of each and every provision of a plan whereby the bankruptcy court must determine that every provision of a plan would comply with applicable state law if implemented outside of a chapter 11 plan.  As the courts have noted, subjecting the provisions of a plan to the substantive requirements of each state's law would "convert the bankruptcy judge into an ombudsman without portfolio, gratuitously seeking out possible illegalities" in order to find that the second prong of section 1129(a)(3) has been satisfied.  *Frascella*, 360 B.R. at 445 (quoting *Food City*, 110 B.R. at 812).

Approval of the Allen Settlement was properly subjected to the standards of Bankruptcy Rule 9019. Indeed, even if the "entire fairness" standard were applicable to the Allen Settlement, which it was not, the overwhelming benefits of the settlement found by the Bankruptcy Court more than establish that such a standard would be met.

<div align="center">

**V.**

**R[2]'s REMAINING CLAIMS SHOULD BE REJECTED**

</div>

In addition to the foregoing, R[2] asserts a number of additional claims. Their claims are without merit.

### A.    R[2]'s Claim that They Were "Denied" a Recovery And that the Court Failed to Require a "Stand-Alone" Valuation of CCI

R[2] contends that it was entitled to a recovery on its common stock in CCI and that the Bankruptcy Court failed to require a "stand-alone" valuation of CCI.

R[2]'s contention that it was "denied" a recovery is frivolous. The evidence presented at trial clearly established that Charter was insolvent by many, many billions of dollars. *Decision*, 419 B.R. at 231, 259 ("[T]he issues presented arise in an uncommonly complicated setting – a large operationally sound business saddled with almost twenty-two billion dollars in debt."). Accordingly, noteholders of various classes, who were indubitably senior to holders of CCI common stock in the right to a payment, received recoveries substantially below 100% of their claims and in some instances no recoveries at all.

Equally baseless is the contention that the Bankruptcy Court erred by not requiring a "stand-alone" valuation of CCI. CCI had no business or operations of its own of any kind; its sole assets consisted of its stock or equity interests in subsidiaries and its rights to certain intercompany accounts, accounts receivable, and notes. Because the subsidiaries below CCI clearly were insolvent, the equity interests of CCI and Holdco, CCI's immediate subsidiary, in

their respective subsidiaries clearly were worthless.  Evidence as to the value of CCI's remaining assets – the intercompany notes, accounts and accounts receivable – was presented at trial and clearly showed that CCI was insolvent by a huge margin and that noteholders of CCI, let alone equity, were entitled to a recovery of only cents on the dollar.  *Id.* at 261 ("In the event of a liquidation under chapter 7, the CCI Noteholders' recovery would amount to approximately 18.4% of their claims.").  Indeed, $R^2$ failed to present any evidence at trial to show that CCI was solvent or even close to being solvent, other than its misplaced arguments about ownership of the NOLs generated by the operating subsidiaries.  *Id.* at 261-65.

**B.      R$^2$'s Claim That the Bankrutpcy Court Erred<br>In Approving the Releases Provided for in the Plan**

Finally, $R^2$ contends that the Bankruptcy Court erred in approving the releases provided for in the Plan for the parties to the Allen Settlement.

As the cases make clear, third party releases under a Plan may be approved where unusual circumstances where the third parties to be released provide substantial contributions under the Plan.  *See, e.g., Metromedia*, 416 F.3d at 142-43 (Non-debtor releases are permissible in the Second Circuit where "truly unusual circumstances render the release terms important to success of the plan.");  *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992) ("In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.").

Here, as the Bankruptcy Court found, such "unusual circumstances" clearly were met and the releases which were a part of the Allen Settlement were essential to the Plan.  Without the Allen Settlement, the Plan could not have been confirmed; the Allen Settlement provided billions

of dollars of benefits to the estate, enabled the Debtors to reinstate the $8.1 billion of senior debt

and preserve billions of dollars of NOLs and other tax benefits.  As the Bankruptcy Court wrote:

> Given the unusual features of the Plan, the non-debtor contributions extend well beyond the level required for a release. The *Metromedia* Court noted that this determination is "not a matter of factors and prongs," but did provide guidance as to the settings where non-debtor releases may be appropriate. *In re Metromedia*, 416 F.3d at 142. The record establishes that the Third Party Releases are permissible here- the Debtors are to receive substantial financial and non-financial consideration in exchange for the non-debtor releases, there is an identity of interest between the debtors and the non-debtor releasees by indemnification agreements, and this case involves truly unusual circumstances that render the Third Party Releases important to the success of the Plan.

*Decision*, 419 B.R. at 258.

## <u>CONCLUSION</u>

For the reasons set forth above, and in the Debtors' memorandum of law, the appeals of

Law Debenture and R$^2$ should be dismissed, or, if they are not dismissed, should be denied.

Dated: New York, New York
      June 25, 2010

                            ROPES & GRAY LLP

                            By:  *David S. Elkind*
                                  David S. Elkind (DE 4054)
                                  Mark R. Somerstein (MS 9721)
                                  Keith H. Wofford (KW 2225)
                                  Nila W. Williams (NW 5969)
                                  Dana L. Myers (DM 0218)
                                  Nicholas Harper-Smith (NH 5109)

                                  1211 Avenue of the Americas
                                  New York, New York  10036-8704
                                  Telephone: (212) 596-9000
                                  Facsimile:  (212) 596-9090

                                  Counsel to the Official
                                  Committee of Unsecured Creditors